## Richmond.

## RICKETTS v. J. G. McCRORY COMPANY, INC.

### March 20, 1924.

1. MALICIOUS PROSECUTION—*Essential Elements—Favorable Termination of Prosecution.*—One of the essentials to the maintenance of the action for malicious prosecution is that the plaintiff shall allege and prove that the criminal prosecution which is the basis of the action has terminated in a manner not unfavorable to the now plaintiff.

2. APPEAL AND ERROR—*Moot Question.*—The Supreme Court of Appeals will not decide purely moot questions, if the matter in any way appears from the record, or is brought to its attention.

3. MALICIOUS PROSECUTION—*Favorable Termination—Conviction Before a Justice—Payment of a Fine—Right to Appeal—Quaere.*—In the instant case, an action for malicious prosecution, plaintiff was convicted before a police justice, paid the fine and then appealed to the corporation court, where she was tried and acquitted. Defendant contended that under these circumstances the criminal prosecution had not terminated favorably to the plaintiff, as it insisted that the payment of the fine was voluntary and that such voluntary payment put an end to the prosecution, and no appeal could be taken, and hence the judgment on appeal to the corporation court was a nullity.

   *Held:* That in the instant case it was unnecessary to determine this question as even if it be conceded that the acquittal of plaintiff was a valid judgment, yet under the evidence, the verdict for the plaintiff was properly set aside.

4. MALICIOUS PROSECUTION—*Probable Cause—Conviction Before Justice.*—Conviction by a trial justice, though reversed on appeal, is conclusive evidence of probable cause, unless such conviction was procured by the defendant through fraud or by means of evidence which he knew to be false; and before a plaintiff in an action for malicious prosecution can recover, it is necessary for him to allege and prove that a conviction before a justice was obtained by the fraud or perjury of the defendant.

5. MALICIOUS PROSECUTION—*Conviction Obtained by Fraud or Perjury—Allegation and Proof—Case at Bar.*—In the instant case plaintiff was convicted before a justice of larceny of certain articles upon evidence of defendant's agent. The plaintiff alleged that when accosted by defendant's agent and charged with theft that she explained her agitated condition and the agent knew that her explanation was true.

*Held:* That in the absence of any statement of what that explanation was the allegation was of no value as a pleading, and as a matter of evidence, it would be of no value if the articles in question were in fact stolen.

6. MALICIOUS PROSECUTION—*Conviction Obtained by Fraud or Perjury—Allegation and Proof—Case at Bar—New Trial—Verdict Set Aside by Trial Judge.*—In the instant case, an action for malicious prosecution, the main issue was whether agent of defendant had testified falsely that he had seen plaintiff drop an unwrapped doll into her hand bag, and that the doll and other unwrapped articles were found in her bag when she was accosted by the agent and accused of theft. On this subject the testimony of plaintiff was far from satisfactory. Not only did the agent testify that he saw the plaintiff drop a doll into her bag, but two other witnesses testified that she had unwrapped dolls in her bag. Plaintiff, when found guilty by a police justice, promptly paid her fine without intimation of intention to appeal.

    *Held:* That under the circumstances the case was a proper one for the trial court to determine whether there was evidence sufficient to support the verdict, and that its judgment setting aside a verdict for plaintiff would not be disturbed on appeal.

7. APPEAL AND ERROR—*Weight to which a Verdict is Entitled—Verdict Disapproved by Trial Judge.*—A verdict which has been disapproved by the trial judge is not entitled to the same weight on appeal as one that has been approved by him. The very fact that he is given the power to set aside a verdict as contrary to the evidence necessarily means that he must, to some extent at least, pass upon the weight of the evidence.

8. NEW TRIAL—*When Trial Court may Grant—Where Judge would have Found a Different Verdict.*—A trial court cannot set aside a verdict merely because if on the jury the trial judge would have found a different verdict. It must be satisfied from the evidence adduced either that there was no evidence to support the verdict, or that the verdict was plainly contrary to the evidence. This conclusion must be drawn from the whole evidence in the case, but in arriving at its conclusion, it has somewhat more latitude than an appellate court would have in passing upon a verdict that was sanctioned by the judgment of the trial court.

Error to a judgment of the Circuit Court of the city of Norfolk, in a proceeding by motion for a judgment for damages. Judgment for defendant. Plaintiff assigns error.

*Affirmed.*

The opinion states the case.

*Levy & Mitchell,* for the plaintiff in error.

*Pender, Way & Foreman,* for the defendant in error.

Burks, J., delivered the opinion of the court.

This was an action for malicious prosecution brought by the plaintiff in error, who was plaintiff below, against the McCrory Company, in which there was a verdict for the plaintiff for $2,000.00, which verdict the trial court set aside and entered judgment for the defendant. This action of the trial court is the only error assigned.

The proceeding was by written notice of motion for a judgment for $20,000.00 damages. The original notice alleged a malicious prosecution of the plaintiff by the defendant and her acquittal in the corporation court of the city of Norfolk, but it developed on the trial that the plaintiff had been tried and convicted by the police justice of the city of Norfolk, and had appealed to the corporation court, where she was tried and acquitted. The plaintiff was thereupon permitted to amend her notice by alleging that the defendant wilfully and fraudulently caused her to be convicted before the police justice upon evidence that it, or its agent, instigating the prosecution, knew to be false and fraudulent, giving the necessary details, and that upon appeal from that judgment she was acquitted and discharged by said corporation court.

The plaintiff was convicted by the police justice of petit larceny and fined ten dollars. She paid the fine and the costs at the time the judgment was entered, and eight days thereafter appealed to the corporation

court and was bailed to appear at the next term of the
court to answer the charge of petit larceny. We have
not before us all testimony that was given either be-
fore the police justice or the corporation court, but
there is enough to show that the plaintiff, as well as the
agents of the McCrory Company, testified before the
police justice, and that the verdict in favor of the pres-
ent plaintiff was rendered in the corporation court, at
the instance of the prosecuting attorney, before any
evidence was introduced by her.

[1] One of the essentials to the maintenance of the
action for malicious prosecution is that the plaintiff
shall allege and prove that the criminal prosecution
which is the basis of the action has terminated in a
manner not unfavorable to the now plaintiff. This the
defendant denies has been done. It is insisted that the
payment of the fine was voluntary, and that such vol-
untary payment put an end to the prosecution and that
no appeal could be thereafter taken from the judgment
of conviction which had been satisfied; that in all litiga-
tion there must be a real controversy; that the corpora-
tion court was without jurisdiction to hear an appeal,
and that hence the judgment on the appeal to that
court was a nullity.

It is said in a note in 18 A. L. R. 867 that a majority of
the States hold that a voluntary payment of the fine
terminates the action and precludes a review of the con-
viction, and the cases are given by States. A number
of the cases are quoted from in the brief of the de-
fendant in error, among them *Leavitt* v. *People,* 41
Mich. 470, 2 N. W. 812; *Washington* v. *Cleland,* 49
Ore., 12, 88 Pac. 305, 124 Am. St. Rep. 1013; *State* v.
*Pray,* 30 Nev. 206, 94 Pac. 218; *Kitchens* v. *State,* 4 Ga.
App. 440, 61 S. E. 736; *State* v. *Conkling,* 54 Kan. 108,
37 Pac. 992, 45 Am. St. Rep. 270; *State* v. *Cohen,* 45

Nev. 266, 201 Pac. 1027, 18 A. L. R. 864. In the last mentioned case, decided in December, 1921, it is said:

"If this appeal should be maintained, the appellant can derive no benefit in point of law from the judgment of this court. It is insisted that the conviction is erroneous for the reasons given, and casts a stigma upon appellant's good name which he is entitled to have removed by a judgment of reversal. We agree with counsel for appellant, and the poet and authorities he quotes, and are also mindful of the scriptural assurances that a 'good name is better than riches.' Its loss or impairment is a melancholy disaster to anyone who values it. But we do not perceive how we can revive a dead judgment for the purpose of quieting title to a good reputation. Appellant's opportunity to relieve himself of any odium that may have attached to his name on account of his conviction was lost by his failure to avail himself of the procedure provided for staying the execution of judgment, pending an appeal. See Rev. Laws, sec. 7294."

But in all of these cases the attention of the appellate court was called to the payment before the appeal was decided, and that court refused to pass on a mere moot question. What would have been the effect if there had been a trial of the appeal and a judgment thereon, as in the instant case, was not involved. There are expressions in the opinions in other cases, however, which would indicate that the court was of opinion that the question was jurisdictional and that a judgment on the appeal was void. *State* v. *Lambert,* 52 W. Va. 248, 43 S. E. 176; *Little* v. *Bowers,* 134 U. S. 547, 10 Sup. Ct. 620, 33 L. Ed. 1016; *California* v. *San Pablo, etc., R. Co.,* 149 U. S. 308, 13 Sup. Ct. 876, 37 L. Ed. 747. In the last mentioned case, the matter in controversy was certain taxes which were paid before the hearing of the

appeal, and Mr. Justice Gray said: "But the court is not empowered to decide moot questions or abstract propositions, or to declare for the government of future cases principles or rules of law which cannot affect the result as to the thing in the case before it. No stipulation of parties or counsel, whether in the case before the court or in any other case, can enlarge the power, or affect the duty, of the court in this regard."

In a note to *State* v. *Conkling, supra,* in 45 Am. St. Rep. at p. 272, in speaking of appeals in civil cases, it is said: "Although there is undoubtedly conflict in the cases, the doctrine supported by the great weight of authority is that a judgment defendant does not waive the right to appeal and to reverse the judgment for error, by paying the amount thereof, either before or after taking his appeal, no matter whether the payment is made voluntarily or after execution has issued and been served upon him." Numerous cases are cited to support the text. See also 2 R. C. L. 65, sec. 27; *Nashville, etc., R. Co.* v. *Bean's Ex'r,* 128 Ky. 758, 109 S. W. 323, 129 Am. St. Rep. 333, and note. In criminal cases, see *Barthelemy* v. *People,* 2 Hill (N. Y.) 248; *People* v. *Marks,* 64 Misc. Rep. 679, 120 N. Y. Supp. 1106; *Page* v. *People,* 99 Ill. 418; *Commonwealth* v. *Fleckner,* 167 Mass. 13, 44 N. E. 1053; *Roby* v. *State,* 96 Wis. 667, 71 N. W. 1046.

[2, 3] We have numerous cases deciding that this court will not decide purely moot questions if the matter in any way appears from the record, or is brought to its attention. *Branscome* v. *Cunduff,* 123 Va. 352, 96 S. E. 770, and cases cited. But the point involved in the instant case was what was the effect of the voluntary payment of the fine? This was left undecided in *Commonwealth* v. *Bass,* 113 Va. 760, 74 S. E. 397. Nor is it

necessary now to decide it, in the view we take of the evidence, even if it be conceded for the purposes of the case, that the acquittal of the plaintiff was a valid judgment.

In passing, attention may be called to the fact that it is not clear that the payment of the fine by the plaintiff was voluntary, for section 4989 of the Code provides that upon an appeal from the judgment of conviction by a justice the defendant shall be committed to jail unless admitted to bail.

[4] It is settled law in this State that conviction by a trial justice, though reversed on appeal, is conclusive evidence of probable cause, unless such conviction was procured by the defendant through fraud or by means of evidence which he knew to be false. *Saunders* v. *Baldwin*, 112 Va. 431, 71 S. E. 620, 34 L. R. A. (N. S.) 958, Ann. Cas. 1913 B, 1049; *Craft* v. *Maloney Belting Co.*, 117 Va. 480, 85 S. E. 486; *Klaff* v. *Va. Ry. & P. Co.*, 120 Va. 347, 91 S. E. 173. Before the plaintiff could recover, therefore, it was necessary for her to allege and prove that the conviction before the police justice was obtained by the fraud or perjury of the defendant, or its authorized agents, and this she endeavored to do. Did she do it?

The defendant conducted a five and ten cent store in the city of Norfolk, and the custom of the store was to wrap all articles sold before delivery to the purchaser. The plaintiff, accompanied by two of her children, aged respectively four and seven years, the latter deaf and dumb, went into the defendant's store to make certain purchases. While there the defendant's manager accosted her and accused her of putting articles in her handbag which she had not paid for, and took her back to a room in the rear of the store to examine her handbag. The bag contained various unwrapped articles,

and the manager, Meyers, left her in charge of other em-
ployees of the store and went out on the street and got a
policeman, and the three walked down to the office of
the police justice where the manager swore out a war-
rant against her for the larceny of one lot of toys of the
value of ninety-five cents and three bars of soap of the
value of thirty cents.   The case was set for trial the next
day, December 16, 1919, and upon the trial the police
justice fined her ten dollars, which, with the costs, she
then and there paid, saying nothing about an appeal.
At some time while she was in the store, the deaf and
dumb child got separated from the mother, and she was
greatly agitated and excited on the subject.   There was
much testimony on this subject, and it is so commingled
with the testimony on the real issue as at times to ob-
scure it.   The testimony of the plaintiff was that the
child had strayed from her side and that she was looking
for it, with some of the toys in her hand, when she was
accosted by the manager, while the latter testified that
both children were with her when she went with him to
the rear room, and that one of them strayed off while
they were in the room.   We do not regard this as
material except to show the excited and anxious condi-
tion of the mother.

There is much verbiage in the amended notice, and
much more in the testimony of the plaintiff.   The only
material point was whether the conviction of the plain-
tiff in the police court had been brought about by the
testimony of the manager which he knew at the time to
be false.   The allegation of the amended notice on this
question was: "And having caused the arrest of the
said plaintiff the said defendant procured her conviction
upon substantially the following testimony:   The wit-
ness Meyers, agent for McCrory and Company and man-
ager of their store, testified: 'When I stopped her she

made no explanation but dropped her head dejectedly and said nothing about the loss of her child,' and further that the articles she had in her handbag were stolen and not wrapped, when he knew they were wrapped and he knew she did explain and he knew her explanation was true and he knew she had lost her child, and all and singular the other testimony offered by the manager, Meyers, which was false and known by him to be false and fraudulent; that said conviction was procured in the police court of the city of Norfolk before Police Justice Simmons on the 6th day of December, 1919; and further that the agent Meyers testified that she did not lose her child until after he had accosted her, when he knew this to be false and he knew the child was lost before this time." An analysis of the false testimony alleged to have been given by the manager shows it to have been (1) "When I stopped her she made no explanation but dropped her head dejectedly and said nothing about the loss of her child;" (2) that the articles she had in her bag were stolen and not wrapped when he knew they were wrapped; (3) that she did explain and he knew her explanation was true; and (4) that he knew she had lost her child and he testified "that she did not lose her child until after he had accosted her, when he knew this to be false, and he knew the child was lost before this time."

[5, 6] It is not practical to give the testimony of the plaintiff in full, but it was directed very largely to allegations 1, 3 and 4 above—indeed, so largely that it was difficult to get satisfactory answers to allegation No. 2. When the child was lost, or whether or not she "dropped her head dejectedly" were insignificant, if not immaterial, details. "That she did explain and he knew her explanation was true," is of no value as a pleading in the absence of any statement of what that explana-

tion was. As a matter of evidence it could be of no value, if the articles were in fact stolen. Hence, the main issue presented by the amended declaration was, that the articles she had in her handbag were stolen and not wrapped, when he knew they were wrapped." The plaintiff practically rested her case on the allegation that there were no unwrapped articles in her handbag, and that her conviction was brought about by the false testimony of Meyers that he had seen her drop an unwrapped celluloid doll in her handbag, and that the doll and other unwrapped articles were found in her handbag. On this subject the testimony of the plaintiff is. far from satisfactory. Her testimony is largely taken up with the loss of her child, with what Meyers said at the two trials of the criminal warrants, with conversations at the store, and with other matters largely foreign to the issue to be tried. Her testimony on these subjects is so intermingled with that on the subject of having unwrapped articles in her handbag that it is difficult to follow her. On the latter subject she testified that the articles she had in her handbag "were wrapped up in envelopes and paper bags," and that the manager did not find anything in her handbag but what she had bought and paid for. When asked the specific question if they were wrapped up, she replied "Yes, sir. They wasn't wrapped in paper, but they was in envelopes. Most of the things were in envelopes, you know, when they give them back." Yet on cross-examination she admitted there were unwrapped articles in her handbag, such as soap, cotton and "things like that." She denied, however, that there were any celluloid articles in her bag. Her testimony on cross-examination on this subject was as follows:

"Q. Mrs. Ricketts, were there any unwrapped articles in this bag?

"A. In my bag; yes, sir.

"Q. How many, do you remember?

"A. No, sir; I can't remember exactly because the candy I bought was already in the bag and the peanuts was in the bag.

"Q. But there were some unwrapped articles in there?

"A. Such as soap; bar of soap and things like that, and cotton and things like that, and the most of them were in envelopes and when Mr. Myers took them out of my bag, messed—

"Q. Were there any celluloid articles in there that were unwrapped.

"A. No, sir; only the baby that he carried in.

"Q. I beg pardon.

"A. Only the babies that he carried in, taken from my hand, but they were not in my handbag.

"Q. Did you ever see Mr. Myers before?

"A. Yes, sir; I would see him when I would go in the store.

"Q. Did you know his name, or did he know you at all?

"A. No, sir; I didn't know his name until I found out in court that day.

"Q. Is there any reason that you know of why Mr. Myers should have any desire to injure you?

"A. I don't see why he should.

"Q. You were unacquainted up to that time?

"A. Yes, sir.

"Q. You had not talked to him up to that time?

"A. No, sir."

In addition to her own testimony on the facts of the case the plaintiff proved an excellent character.

Not only did Myers testify that he saw the plaintiff drop a celluloid doll in her shopping bag, but two other

witnesses testified that she had celluloid dolls unwrapped in her handbag. She admits having celluloid dolls in her hand when accosted by the manager, and in her excitement and agitation, as she describes her condition at the time, it may be that she unintentionally dropped two of them in her handbag, but even upon this hypothesis, the manager could not be said to have been without probable cause for believing that the act was intentional. The manager had never seen the plaintiff before that day.

The learned judge of the trial court saw the witnesses and heard them testify. He knew that she had counsel before the police justice, and that she promptly paid her fine and the costs without the suggestion of an intention to appeal. With all this before him, he was unable to find evidence sufficient to support a verdict that her conviction by the police justice had been procured by the manager by means of evidence which he knew to be false, and we are unable to say that he was wrong. It is not a case of mere conflict of evidence, but the exceeding improbability of the manager having an unknown customer arrested without cause, coupled with the unsatisfactory testimony of the plaintiff as to what transpired, her conviction by the police justice, her prompt payment of the fine without intimation of an intention to appeal, and the positive statement of two other witnesses corroborating the statement of the manager, made a proper case for the trial judge to determine whether there was evidence sufficient to support the verdict. He decided that there was not, and the record before us sustains that finding. At least it does not show error in his conclusions.

[7] A verdict which has been disapproved by the trial judge is not entitled to the same weight on appeal as one that has been approved by him. *DuPont* v.

*Taylor*, 124 Va. 766, 98 S. E. 866. The very fact that he is given the power to set aside a verdict as contrary to the evidence necessarily means that he must, to some extent at least, pass upon the weight of the evidence. "It would, indeed, be a futile and idle thing for the law to give a court a supervisory authority over the proceedings and the manner of conducting a cause before the jury, and the right to set aside the verdict of the jury therein because contrary to the evidence, unless the judge vested with such power could consider, to some extent at least, the evidence in the cause; * *" *Cardwell* v. *Norfolk & Western R. Co.*, 114 Va. 500, 506, 77 S. E. 612, 614.

[8] But this does not mean that he can set aside a verdict merely because if on the jury he would have found a different verdict. He must be satisfied from the evidence adduced either that there was no evidence to support the verdict, or that the verdict was plainly contrary to the evidence. This conclusion must be drawn from the whole evidence in the case, but in arriving at his conclusions he has somewhat more latitude than this court would have in passing upon a verdict that was sanctioned by the judgment of the trial court. *Chapman* v. *Va. Real Estate I. Co.*, 96 Va. 177, 31 S. E. 74; *Davis* v. *McCall*, 133 Va. 494, 113 S. E. 835; *Forbes & Co.* v. *Southern Cotton Oil Co.*, 130 Va. 245, 108 S. E. 15.

The result of the litigation as a whole leaves the plaintiff with her reputation vindicated by the verdict of a jury and the judgment of the corporation court in her favor, but without the right of recovery of damages against the defendant because of her inability to show that her conviction by the police justice was procured by the defendant by means of evidence which the defendant's manager knew to be false.

We are unable to say that the judgment of the trial court is wrong, and it will accordingly be affirmed.

*Affirmed.*

SIMS, P., dissenting:

If I could concur in the statement in the majority opinion that the main issue presented by the amended notice of motion was " 'that the articles she' (the plaintiff, Mrs. Ricketts) 'had in her handbag were stolen and not wrapped,' when he knew they were wrapped * * * and that her conviction (before the police justice) was brought about by the false testimony of Meyers that he had seen her drop an unwrapped celluloid doll in her handbag and that the doll and other unwrapped articles were found in her handbag," I would concur in the conclusion that there was not sufficient evidence to support the verdict in finding that the conviction just mentioned was obtained by the false testimony of the manager, Meyers, as the testimony of the plaintiff, Mrs. Ricketts, as to the particulars of those subjects as they appeared to the manager at the time was ambiguous and uncertain.

But, while the question of whether the conviction before the police justice was obtained by false testimony of the manager there given touching the particulars just mentioned, and whether that testimony was known to be false by the manager at the time he gave it, was one of the issues presented by the amended notice, it was not, as appears from the amended notice and the testimony, the only or the main issue so presented.

The amended notice of motion contains the following allegations:

"And the plaintiff avers that the said defendant, after having caused her arrest, did unlawfully and fraudu-

lently procure her conviction in the police court of the city of Norfolk on the 16th day of December, 1919, by testimony presented by the agent of the defendant, in that he testified at said trial that the plaintiff did not make any explanation to him regarding her presence in the store at the location at which he accosted her, nor did she make any statement to the effect that she was looking for her child, which the said plaintiff avers she did say to him, and further that she stated to him at the time that she had lost her child and that her presence in that part of the store at which the agent of the defendant accosted her, that she was looking for a child of hers that she brought in the store with her and she had gotten away from her, and further stated to the said agent that the child had caused her concern because he was deaf and dumb; and the plaintiff further avers that the said agent of the defendant knew the testimony that he gave at the trial in the police court of the city of Norfolk was false and fraudulent. * *

"And having caused the arrest of the said plaintiff, the said defendant procured her conviction upon substantially the following testimony: The witness Meyers, agent for McCrory and Company and manager of their store, testified: 'When I stopped her she made no explanation, but dropped her head dejectedly, and said nothing about the loss of her child,' and further that the articles she had in her handbag were stolen and not wrapped, when he knew they were wrapped and he knew she did explain and he knew her explanation was true and he knew she had lost her child, and all and singular the other testimony offered by the manager, Meyers, which was false and known by him to be false and fraudulent; that said conviction was procured in the police court of the city of Norfolk before Police Justice Simmons on the 6th day of December, 1919; and, fur-

ther, that the agent Meyers testified that she did not lose her child until after he had accosted her, when he knew this to be false and he knew the child was lost before this time."

It will be observed that the allegation that the aforesaid conviction was obtained upon the false testimony of the manager, "that the articles she had in her handbag were stolen and not wrapped when he knew they were wrapped," is but a subsidiary part of the allegations of the amended notice of motion. The gravamen of the allegations, and of the testimony of and for the plaintiff, introduced under such allegations without objection thereto as not being covered by the allegations, is that the conviction before the police justice was obtained by the testimony of the manager, which was false and known by him to be false at the time in this: That the manager there falsely testified that when he first accosted Mrs. Ricketts she made no explanation, but dropped her head dejectedly, and said nothing about the loss of her child, and subsequently, in the stockroom, expressly confessed her guilt of the theft; whereas the fact was, as Mrs. Ricketts testified, that she did explain to him, at the time she was first accosted by him, that she was innocent and that she had lost a child that she had brought into the store with her, that had gotten away from her, which caused her great concern, because he was deaf and dumb; and that, therefore, the manager knew, at the time he testified as aforesaid to the contrary, that his said testimony was false. And the status of the testimony upon this issue, which I would designate the main issue presented by the amended notice, was as follows:

The manager by his testimony showed that he testified before the police justice, and that his testimony there was the same upon the issue just mentioned as the

testimony he gave on the trial of the instant case. On the trial of the instant case he testified, as to what occurred when he first accosted Mrs. Ricketts and subsequently thereto, as follows:

"Q. Did she give you any explanation?

"A. No explanation whatsoever up to that time.

"Q. All right; go ahead?

"A. I said, 'by the way, you have got other merchandise in there.' She could not give me any explanation of that. I said, 'Come along and have a talk with me.' The lady and the two small boys accompanied me to the stock room.

"Q. Were there two boys with her at that time?

"A. Yes, sir; both boys with her at that time.

"Q. Go ahead.

"A. After we got to the stock room, I said I would like to know about the merchandise. She couldn't give me any explanation. * * *

"A. I said I want an explanation as to the merchandise in the shopping bag. She couldn't give me any. After questioning her several times she said: 'Please let me pay for it and I will never do it again.' That statement made two or three times. I said: 'It is too late, I will have you arrested.' I had an officer called and explained the matter to him and had her arrested. * * *
* * * * * * * * * *

"Q. * * * Mr. Myers, it has been testified or intimated here that you obtained her conviction in the police court by means of perjury or false testimony, is that correct?

"A. No, sir; I didn't make any false testimony at all.
* * * * * * * * * *

"Q. Now, at the time, Mrs. Ricketts; you say you saw her drop this doll in the shopping bag; you say there were two children with her at that time.

"Q. Will you tell the jury whether those two children accompanied her back to the stock room?

"A. Both children accompanied her back to the stock room.

\*     \*     \*     \*     \*.     \*     \*     \*     \*     \*

"Q. What became of the two children, Mr. Myers, after you and Mrs. Ricketts went there to the stock room?

"A. Well, I called the officer; Mrs. Ricketts seemed to be excited and one child got excited and left the stock room.

"Q. Which one, the larger or smaller one?

"A. I would not be able to say. They both ranged between eight, ten or twelve years of age, but I think it was the one who was afflicted. I won't be positive, but there was one that went away at that time.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"Q. Did she ask to leave there; to get out of the room?

"A. Yes, sir.

"Q. What did she say about that, if anything?

"A. 'Oh, please let me pay for it, mister, I will never do it again.'

"Q. I mean to get out of the room?

"A. She said let her get her child.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"Q. Will you please state if you made any effort to find the child?

"A. There was effort made when the policeman came; not before that.

"Q. Who did that?

"A. Mr. Ruhl and the officer.

"Q. What did they do?

"A. They went out in the store room to look for it.

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*

"Q. Did you testify in the police court that she told you she was sorry and wanted to pay for it?

\* \* \* \* \* \* \* \* \* \*

"Q. Did you testify before Judge Simmons that she said she would not do it again and would pay for it?

"A. Yes, sir.

\* \* \* \* \* \* \* \* \* \*

"A. I asked an explanation of how the articles got in her shopping bag.

"Q. What did she say?

"A. She couldn't give me none.

"Q. What else did she say?

"A. After several questions, pressing her, she said: 'Please let me pay for it; I will never do it again.'

\* \* \* \* \* \* \* \* \* \*

"Q. Where were the children?

"A. One of them left just at that time.

"Q. What time?

"A. Just as I called the officer; she got excited and one child left the room.

"Q. Now, Mr. Meyers, isn't it a fact that when you saw her, wasn't she excited?

"A. She was excited in the stock room.

"Q. I say when you first saw her and accosted her, state whether or not she was excited?

"A. She did not seem excited at all.

"Q. Not at all?

"A. No, sir.

"Q. Did she say anything to you about having lost the child?

"A. No, sir.

"Q. How did you know one of her children was deaf and dumb?

"A. I learned that later. I didn't know it at that time.

\* \* \* \* \* \* \* \* \* \*

"Q. When did you first see these two children?

"A. You mean first?

"Q. Yes.

"A. I noticed them standing at the toy counter.

"Q. They were both there with her?

"A. Yes, sir.

"Q. Then if she testifies she was looking for the child at the time you accosted her, she is telling something that is untrue?

"A. They was both there.

\* \* \* \* \* \* \* \* \* \*

"Q. Then if she testified she was looking for the child at the time you accosted her, she is telling something that is untrue? Is that right?

"A. Yes, sir.

\* \* \* \* \* \* \* \* \* \*

"Q. Did the two children go back with you and her to the stock room?

"A. Yes, sir.

"Q. Where did the other child go to?

"A. When she got excited; one got excited when she got excited and left the stock room.

"Q. The deaf and dumb one got excited; the one that could not hear, is that the one that got excited?

"A.. I should think so; I don't know."

The testimony of Mrs. Ricketts was in direct conflict with that of the aforesaid manager above mentioned upon what I have ventured to characterize as the main issue, and there is nothing uncertain in the case or ambiguous about her testimony on that issue.

Her whole testimony is to the effect that she was not guilty of the theft with which she was charged by the said manager; that she did not confess her guilt to him, as he falsely (as she claimed) testified before the police

justice that she did; that, on the contrary, she expressly denied to him that she was guilty, and expressly explained to him, at the time he first accosted her, the reason for her presence where she then was, and for her excited manner, etc., namely, that she had lost one of the two children who had been with her, a deaf and dumb child, and was in distressed search for that child at the time; whereas said manager falsely (as she claimed) testified before the police justice that she did not make such explanation; and further testified before the police justice falsely (as she claimed) that she had both of her two children with her at the time; that the deaf and dumb child did not leave her until after they got to the stock room and that it was not until then, and after Mrs. Ricketts had confessed her guilt, that this child went away; and that she thereafter, for the first time, stated that she had lost one of her children.

The following appears in the testimony of Mrs. Ricketts, given before the jury on the trial of the instant case:

"A. I was in the store. I didn't give the gentleman any reason to think I was going to leave the store, and I didn't intend to leave the store; I was looking for my little child that had been lost. I had been in the store and was piling up some toys on the counter to be wrapped up, and I had turned and picked up three celluloid babies and put them with them, and when I missed my child and in the excitement I left the counter, knowing he could not talk and hear, and had no intention of leaving the store, when this man came up and accused me of taking the babies.

\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*　　\*

"I did not intend to leave the store at all. I was just walking around the store to see if I could find my child, when he came and accused me of taking these dolls. I

told him I did not intend to take the dolls, I had lost my child. He said: 'You have your child with you. I have had these things tried on me before,' he says, 'you get in here and let me see what you have got in your hand.' I told him I had nothing that belonged to him. He says: 'That is what I am going to see now; if you will take one thing you will take another.' He took me back into the stock room and would not let me look for my child at all until the arresting officer came.

\* \* \* \* \* \* \* \* \* \*

"Q. How many children did you have with you that day?

"A. Two.

"Q. How old are they?

"A. One was four years old then and one seven.

"Q. What became of the child that was not with you at that time?

"A. I never saw the child any more until after two that afternoon. He got away some way or another without my knowing.

"Q. Is the child normal?

"A. He can't hear and talk; no, sir.

\* \* \* \* \* \* \* \* \* \*

"Q. The child can neither hear nor talk, and that was the child that you were looking for at the time?

"A. Yes, sir.

"Q. Now, was that fact brought to the attention of the manager of the store?

"A. Yes, sir.

"Q. What did he say then?

"A. He made the objection I didn't have the child, he contended I had the child with me, which was the other small child.

\* \* \* \* \* \* \* \* \* \*

"Q. And when you told him you had another one, he said he had heard that yarn before?

"A. Yes, sir.

"Q. What else did he say?

"A. Said he had these things tried on him before and. I had the child with me, and he had taken me back in the store to see what I had in my own pocketbook.

"Q. Where did he take you?

"A. Back in the stock room, I believe; a room in the back.

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*

"Q. What did he say in the police court about the child?

"A. He said the child got away afterwards.

"Q. How many children did he say you had at the time you were arrested?

"A. Said I had two.

"Q. Both of them were with you?

"A. Yes, sir."

That is to say, the testimony of the manager before the jury was to the effect that the conviction of Mrs. Ricketts before the police justice was obtained by his. (the manager's) testimony there, that Mrs. Ricketts,. both by her manner in failing to make any explanation at the time he first accosted her and accused her of the theft, and by her expressed confession afterwards in the stockroom, acknowledged her guilt of the theft;. and the manager still contended that that testimony of his was true; whereas Mrs. Ricketts testified before the jury, unequivocally and circumstantially, to the effect that such testimony of the manager, on which her conviction before the police justice was admittedly obtained, was false and known by the manager to be. false at the time he gave it.

This presented, as it seems to me, squarely before the jury the issue of credibility of these two witnesses— which was to be believed? Both could not be telling:

the truth. If the testimony of Mrs. Ricketts was to be credited the conviction before the justice was obtained upon false testimony of the manager, which he knew to be false at the time he gave it, to the effect that the plaintiff first tacitly, by her conduct, and afterwards expressly confessed her guilt of the theft with which the manager charged her. If the testimony of the manager was to be credited, such conviction was obtained upon testimony of the manager which was true. All of the decisions in this jurisdiction agree that the decision of such an issue, being one solely of credibility of the witnesses, is wholly within the province of the jury and that the decision of it cannot be properly disturbed by the court. Therefore, as I think, the verdict settled the aforesaid conflict in the testimony in favor of the plaintiff, Mrs. Ricketts, and in effect found (and hence the court should so find) that the conviction aforesaid was procured by the perjury of the manager of the defendant acting within the scope of his employment, so that, in law, the conviction was obtained by fraud by which the defendant cannot be allowed to benefit.

I am, therefore, constrained to dissent from the conclusion reached by the majority opinion.