# Richmond.

## FRANK SHOEMAKER v. J. P. ANDREWS.

March 13, 1930.

Absent, Hudgins, Gregory and Browning, JJ.

The opinion states the case.

*Claude R. Wood* and *Hubard & Boatwright*, for the plaintiff in error.

*Strode & Edmunds*, for the defendant in error.

PRENTIS, C. J., delivered the opinion of the court.

The cause of action of Frank Shoemaker, plaintiff, is that he was seriously injured and the mule which he was riding was killed, as he alleges, by the negligence of Andrews, the defendant. The notice, as amended, alleges that while he was proceeding in a westerly direction on the highway, keeping close to the right or north side, and Andrews was driving his automobile in an easterly direction upon the north or wrong side

of the highway, at the excessive rate of speed of forty-five miles an hour, without lights, the time being about 6 p. m., January 13, 1928, the defendant recklessly, wantonly and negligently drove the car upon the mule which the plaintiff was riding, and thus caused the injuries.

There was a verdict in favor of the plaintiff for a substantial sum, which the trial court set aside as unsupported by the evidence, and thereupon entered judgment in favor of the defendant.

There are several errors assigned, but it is only necessary for us to consider the controlling issue, and that is whether or not the evidence is sufficient to support the verdict.

We think it hardly necessary to repeat the general rules governing such cases. These rules have been repeatedly and sufficiently expressed by this court.

There were only three persons present at the time of the occurrence. The plaintiff testifies that he has no recollection on the subject. Whether this is because of the seriousness of his injuries or for some other unexplained reason does not appear. The defendant testified clearly as to the occurrence and his testimony, if true, shows that he was guilty of no negligence whatever. The plaintiff's son, a boy of fifteen years, at the trial testified to facts which tended to inculpate the defendant. His statements at the trial, however, differed very materially from his statements as testified to by the plaintiff and two other reputable witnesses, which he made at the time of the occurrence, which also exculpated the defendant.

The applicable statute as to lights is section 50 of the motor vehicle act (Laws 1926, chaper 474), which reads: "Every vehicle upon a highway within this State, during the period from a half hour after

sunset to a half hour before sunrise, and at any other time when there is not sufficient light to render clearly discernible any person on the highway at a distance of two hundred feet ahead, shall be equipped with lighted front and rear lamps * * *."

The precise time of the injury is not clearly shown; it was shortly after 5:30 p. m.

All of the witnesses testified clearly as to the occurrences which they saw. It is not shown that the injury occurred more than half an hour after sunset, and it is clearly shown that there was sufficient light at the time to enable the witnesses to see all that happened; so that there is no proof of this allegation of negligence. It is manifest from the testimony that the failure to have lights did not contribute in any way to the plaintiff's injury. It can hardly be doubted that there must be some connection between the injury and the failure to observe such statutory requirements as a contributing cause of the injury suffered by the plaintiff. *Norfolk Southern R. Co.* v. *Banks*, 141 Va. 722, 126 S. E. 662.

There is no testimony that defendant was driving at an unlawful or excessive rate of speed. The plaintiff's witness, Thompson, who was not at the place, but who had been passed by the defendant's automobile a few minutes before the occurrence, when asked what his rate of speed was, answered: "About thirty or thirty-five miles—probably forty. I don't know exactly. I am pretty sure it was over twenty-five miles as he just walked away from my car like I was standing still." But the plaintiff's son, who was an eye-witness, testified that at the time and place of the occurrence he was driving his car "pretty fast—not so awful fast—about twenty-five or thirty miles." The defendant testified unequivocally that he had not run

as much as thirty-five miles an hour after leaving the concrete road near Farmville; that he had plenty of time to get to his home at Charlottesville and took his time. When asked to confine himself to the time of the injury, he answered: "I did not keep my eyes on the speedometer. I slowed down to twenty miles an hour and allowed the car to coast and when I saw that I was going to have an accident I slapped the brakes on and the car skidded. I think I had slowed down to about five miles an hour. "Q. Did you at any time exceed thirty miles an hour? "A. No, sir; I know that is true." This is the substance of all of the testimony as to excessive speed. It clearly fails to establish that allegation of negligence.

The plaintiff and his son had stopped their day's work at Dillwyn at 5:30 p. m., and were going home. The son was in front mounted upon a white mule, and the plaintiff was following upon a dark mule. The defendant was driving his car in the opposite direction. They had no difficulty in seeing each other. As has been indicated, the only testimony upon which a verdict could in any aspect be based is that of the plaintiff's son given at the trial. After having testified that they were riding on the proper side of the road, and that the defendant passed him; that the mules showed no sign of being frightened; that he was about four or five steps in front of his father; that the road was curved, and that defendant struck the mule which his father was riding, and that his father's mule was not at the time frightened; he describes the time of the occurrence as about 5:30; that the mule's right leg was broken and that he had to be killed; that his father was riding closer to the north side of the road than he, his son, was; and that if the plaintiff had stayed on the south side of the road he would not have struck

his father. It is shown that the right front leg of the mule was broken. When asked how that could have happened, he explained it by saying that the mule put the right leg in front first. When asked whether he had not told the plaintiff that his father's mule got scared and ran across the road, he denied it. When asked whether he did not shortly after the occurrence tell Hughes, the traffic officer, that the mule got scared and ran across the road, he denied it. Then he admitted that he talked with Mr. Hughes, and when asked a second time whether he said his father's mule got scared and ran across the road, he answered: "If I did I don't remember it. I remember having some words with him, but I don't remember what I told him—that is, I don't remember what I told him about the mule.

"Q. What did you tell him?

"A. I don't remember all.

"Q. Tell us something of what you told him?

"A. I told him which leg on the mule was broken.

"Q. Was that all?

"A. Yes.

"Q. Well now, Frank, why did you say a while ago that if you told him more you did not remember it?

"A. I did not remember saying that the mule had run across the road."

The plaintiff must recover, if at all, upon this testimony, for there is nothing else.

Three witnesses testified that this witness, shortly after the occurrence, said that the cause of it was because the mule "buck-jumped" and got in front of the approaching car.

The defendant had been to Farmville in connection with his business as district forester, and was on his way to his home at Charlottesville. He said he had

ample time to get home, and then described the oc-currence thus: "When I got a few car lengths to where the Slate River road comes into Route 32, I saw approaching two persons riding a mule each. They were way ahead, on their side of the road and plenty of room for them to have their side of the road. I slowed down and noticed my speedometer. It was in January and dusty a little. I suppose behind me there was considerable dust. I slowed down and I thought they could see me. The mules did not pay any attention to the car, and I was thinking of going ahead pretty soon. I realize that if a man has mules hitched to a wagon you can manage them better than riding them. The road was almost level but the road has a little curve, but for that reason I could see the road a pretty good distance, but when I got within four or five lengths the mule got frightened and turned down the road and was going down the road in the same direction I was going, but the rider sawed his mouth and my car was well over to the ditch and when I saw the mule was frightened I went over to the ditch and slowed down, but still the mule had reared up a time or two. I never saw a mule run right into anything myself, and of course, all of this happened very quickly. I saw that I was getting dangerously near and put on the brakes. The brakes stayed on until I could see the mule coming to the left side and then I could see the mule's shoes. My window on the left side was down and I naturally expected his feet to come in at my car window and my car rolled a little as the mule was hit. The left light hit the mule on his right front leg and broke it, and something—I suppose it was the mule's head—hit the windshield and mashed it in. Up to that time I had not been excited and as quickly as I could I stopped the car and left it and ran back. And what

excited me most was when I found Mr. Shoemaker had been hurt and he looked like he was dead. I felt his pulse. I said to the boy: 'How did it happen?' And the boy said the mule jumped in the road, and without looking up to see whether the car was on the crown of the road going to Dillwyn, I moved Mr. Shoemaker several feet, and then a car stopped and a man came on down. * * * When I approached these mules they were being ridden, the brown mule being the nearest to me. He was nearer the crown of the road." He testified that all objects were perfectly visible, and that he could see the mules a long time before he got to them. He testified that the left side of his car was actually struck; that the left lamp was mashed down.

Upon cross-examination this question and answer appear:

"Q. Tell us exactly how far the mule was from you.

"A. I said in the first place and I say it now that when I got in four or five car lengths the brown mule became very much frightened and undertook to wheel back and go in the opposite direction and the rider see-sawed his mouth and he bucked considerably, and the mule headed directly across the road, and instead of trying to stop him, if I had opened up at good speed I would have gotten by before the mule got across the road enough for him to strike the car.

"Q. You say you were four or five car lengths of the mule? Could you have stopped then?

"A. Yes. If I had done all the braking and everything in a moment I might could have.

"Q. Now, if your brakes were in good working order and your car was going only fifteen or twenty miles an hour, you could have stopped then?

"A. Yes; I could have stopped.

"Q. Now, didn't the driver do what he could do to stop the mule?

"A. Apparently he was trying to keep the mule from going down the road and the mule was rearing and bucking and neither went up or down, but went across the road."

Physical facts, which are not disputed, fully corroborate the defendant's account of the collision. If the account of the plaintiff's son, given at the trial, were true, and the mule and the car were meeting each other, and the right leg of the mule was broken because it was first, then the injuries to the mule and probably to the car would have been more serious; certainly the injuries to both would have been in front, whereas the injuries to the mule were on his right side, and the injuries to the car were on the left side. This is sufficiently explained by the account of the defendant— that is, when the mule, facing west, started across the road to the south, he must have turned his right side towards the car. This also accounts for the fact that his right leg was broken, and that the other injuries to the mule were not in front but on his right side.

These physical facts clearly indicate that the car was at the time being properly driven on the right or south side of the road. The fact that he passed the white mule safely is also significant. If the son's account of the occurrence were true, the brown mule being only a few steps behind the white mule, instead of being struck on his right side, he would certainly have been struck on his left side.

These statements, made by Burks, J., in *Ricketts* v. *J. G. McCrory Co.*, 138 Va. 548, 121 S. E. 916, 920, are worthy of repetition:

"A verdict which has been disapproved by the trial judge is not entitled to the same weight on appeal

as one that has been approved by him. *DuPont v. Taylor*, 124 Va. 766, 98 S. E. 866. The very fact that he is given the power to set aside a verdict as contrary to the evidence necessarily means that he must, to some extent at least, pass upon the weight of the evidence. 'It would, indeed, be a futile and idle thing for the law to give a court a supervisory authority over the proceedings and the manner of conducting a cause before the jury, and the right to set aside the verdict of the jury therein because contrary to the evidence, unless the judge vested with such power could consider, to some extent at least, the evidence in the cause; * * *.' *Cardwell v. Norfolk & Western Ry. Co.*, 114 Va. 500, 506, 77 S. E. 612, 614.

■ "But this does not mean that he can set aside a verdict merely because if on the jury he would have found a different verdict. He must be satisfied from the evidence adduced either that there was no evidence to support the verdict, or that the verdict was plainly contrary to the evidence. This conclusion must be drawn from the whole evidence in the case, but in arriving at his conclusions he has somewhat more latitude than this court would have in passing upon a verdict that was sanctioned by the judgment of the trial court."

■ In *Vandenbergh & Hitch, Inc.* v. *Buckingham Apartment Corp.*, 142 Va. 397, 128 S. E. 561, this is said: "While the court might be compelled to accept evidence given by the plaintiff on a demurrer to the evidence by the defendant, yet, under this section (6251) and section 6363, such evidence need not be accepted, when to do so would strain the credulity of the court, and require the entry of a judgment contradicted by every other fact and circumstance of the case. It is extreme cases of this sort that the statute

was enacted to meet." *Brooks* v. *Commonwealth*, 145 Va. 853, 134 S. E. 726, enforces the same rule.

In *Norfolk Southern R. Co.* v. *Hudgins*, 150 Va. 228, 142 S. E. 409, 411, it is said: "While we adhere to the rule of decision as to the weight that should be given to the verdict of a jury upon a conflict of the evidence, we are of the opinion that the language placed by the revisors in section 6363, 'unless it appears from the evidence that such judgment is plainly wrong,' should not be held to be meaningless." This is quite applicable in this case.

In *Meade* v. *Saunders*, 151 Va. 641, 144 S. E. 711, 712, we find this expression: "This case is before us as the result of the exercise by the court of the power conferred by section 6251, and while the principles of law to be applied by the appellate tribunal under such circumstances are analogous to those controlling demurrers to evidence, they are not entirely the same. Where it can be seen from the evidence as a whole that the verdict has recorded a finding in plain deviation from right and justice, the court may, indeed it should, set it aside."

The trial court rightly applied these principles in this case and the judgment will therefore be affirmed.

This case may be compared with *Ellison* v. *Hampton & Langley Field Ry. Co.*, *ante*, page 39, 152 S. E. 373, this day decided, in which the proceedings were similar, but the judgment of the trial court in favor of the defendant, notwithstanding the verdict, was reversed. There the physical facts supported the verdict, while here the physical facts discredit it.

*Affirmed.*