# 𝕽𝖎𝖈𝖍𝖒𝖔𝖓𝖉

## WILLIAM PARSONS v. A. J. PARKER.

January 14, 1932.

Present, Campbell, C. J., and Holt, Epes, Hudgins and Browning, JJ.

The opinion states the case.

*Thos. H. Nottingham, Warner Ames* and *J. Brooks Mapp,* for the plaintiff in error.

*Quinton G. Nottingham* and *James E. Heath,* for the defendant in error.

Browning, J., delivered the opinion of the court.

This litigation implicates a startling amour between an obtuse and credulous man fifty-one years old and a girl fourteen of singular precocity. The record of the evidence is verbose and prolix and presents a chapter of loathsome and shocking details, perhaps not to have been avoided, but certainly no wholesome purpose would be promoted by recurring more specifically to them than is necessary.

The girl, whose name is Grace Rebecca Parker, is the daughter of A. J. Parker, who was the plaintiff in the action with which we are concerned. Her parents resided in the county of Warwick at or near Hilton village. They have a married daughter, sister of Grace, Mrs. Orion T. Griffith, who resides with her husband in Northampton county, near the village of Capeville. Grace visited her married sister in August, 1927; went to the Capeville public school in the term of 1927-28, and spent a part of the subsequent summer at her sister's home. Mrs. Griffith went to her parent's home in Warwick county to spend Christmas day of 1928, and Grace returned with her for an indefinite stay. In the early part of 1929 she formed an acquaintance with William Parsons, who was the defendant in this action. Parsons and his brother, Walter, are two middle aged bachelors, who had lived for years by themselves, doing their own domestic work. They seem to have been veritable recluses. Their home was not far from that of the Griffiths, of which Grace was a rather constant inmate.

The circumstances of the meeting of this strange and, ordinarily one would say, incompatible couple, were these: Each of the Parsons brothers had recently become possessed of quite large fortunes, and Griffith, the brother-in-law of Grace, desiring to negotiate a loan of $10,000.00 from them, went to their home one morning in the early part of January, 1929, taking Grace with him. While Griffith was discussing

the business matter on the porch with Walter Parsons, Grace was invited in the house, and there conversed with William Parsons. When Griffith, with Grace, was leaving he made some remark about the desirability of William Parsons getting married, to which Parsons replied, in effect, that he didn't suppose anybody cared for him. A short while thereafter, maybe a day or two, Grace wrote Parsons a letter, its purport being that he was in error as to no one caring for him, and asked if she might correspond with him, and then there ensued a correspondence between them which we here set forth as it appeared in the record:

### EXHIBIT 1.

"CAPE CHARLES, VIRGINIA, *January 7,*
"R. F. D. No. 1.

"MY DEAR MISS PARKER:

"It was a jolly surprise to hear from you. I always treasure the thought of having a girl like you to think of me in that way. It is a real New Years' greeting and, yes, I wish you and Mr. Griffith stay with us longer. Yes I would suggest that both of you would call again. It would be all right for you to write to me.

"Your friend
"WM. PARSONS."

### EXHIBIT 2.

"*March 11, 1929,*
"9 P. M.

"DEAR MISS PARKER:

"The handkerchief came today. I will hasten and write with my deepest sorrow and regret that things has happen this way.

"Your request that I send you the valentines back. I've had three or four valentines this season and they all have been destroyed beyond recovery and so what can I say or do to mend this?

"Grace, may our mistakes serve a useful purpose. May

it be a means of inspiring us to livelyer faith and hope for a better day.

"I trust this is altogether fitting and appropriate for me to write to you. I think of you every day and when the dark shadow of night fall you linger in my memory.

"Grace, I hope and trust that you will enjoy life in the truest and best sence of the word.

"Ever I remain your friend

"W. PARSONS."

### EXHIBIT A.

"CAPEVILLE, VIRGINIA, *March 16, 1929.*

"DEAR BILLIE:

"I will answer your letter. Billie, lets get married 30th of April. Billie, you think I want you for your money, but I don't. I love you. Everynight I cry for you. I just can't help crying for you. I think of you all the time.

"By by, from

"MISS GRACE P."

### EXHIBIT 4.

(Post card)

*"Saturday, March 30th.*

"How are you these days; would like to see you and how can I? Just let me here from you.

"WM. P."

(On the back of the card is the following:)

"May Easter Day bring many joys and blessings to you and yours. May this be your sentiment and devotion."

### EXHIBIT B.

"CAPEVILLE, VIRGINIA, *April 2, 1929.*

"DEAR BILLIE:

"Orie said he didn't care about your coming back to see me as long as you would stay in your place & when you want to come write & let me know.

"MISS GRACE PARKER."

## EXHIBIT C.

"CAPEVILLE, VIRGINIA, *April 17, 1929.*

"Say, Billie, if you want to come back to see me write & let me know when you are coming. Let me hear from you.

"MISS GRACE PARKER.

"I'm not going to write to you any more until you write to me."

## EXHIBIT 3.

"*Friday night, April 19, 1929.*

"DEAREST GRACIE:

"Your letter came today. I would like so much to see you, but I would not come to the house to see you.

"It is so bad that we are separated in this way, Grace. I think of you every day. I have not been going to see any other girl since I saw you last.

"Corduly Yours,
"WM. PARSONS."

## EXHIBIT D.

"CAPEVILLE, VIRGINIA, *April 22, 1929.*

"DEAR BILLIE:

"I'll answer your letter received this morning. Say, Billie, I'll tell you what lets do. Orie will be gone Wednesday & wont be back until Thursday, so you come Wednesday night & I'll be sure to go out with you. My sister wont care because Orie will be gon. I ask her. She said if we didn't go far and stay to long. Now I will look for you Wednesday night as I have a good chance to go out with you.

"Yours as ever
"GRACE."

Some while after writing the letter of January 7, 1929, Parsons called to see Grace at the Griffith home, and continued to do so about twice a week until the 19th of February when he was reprimanded by Griffith and forbidden to

return. Parsons said that the lamp had gone out of itself on this latter occasion, and Griffith contradicted him to the extent of charging him with creating the state of darkness for ulterior purposes, charging him at the time with taking, or attempting to take, improper liberties with her. This Parsons denied, and undertook to explain to him the cause of the situation, which he thought he had succeeded in doing. At the trial of the case in judgment, Grace testified that Parsons, on the occasion of several of the visits in February, had imposed criminal indignities upon her by the usual blandishments and importunities, and on one or two of the occasions by promise of marriage. Parsons denied this and gave in detail his version of all that passed between them, admitting nothing more serious on his part than a kiss, which was a requital, in that she had kissed him, and on one occasion putting his hand on her leg after she had thrown her leg over his.

Parsons' visits ceased from the 19th of February, 1929, to the 24th of April of the same year, and during this interim the above correspondence took place. It consists of seven written communications, which, in our judgment, tell their own story, which is of a significance quite different from that attributed to them by counsel for Parker, the plaintiff here. It will be noted that his visits were not resumed until after this correspondence.

It is not difficult for us to see in this drama a young participant, tender in years, but far advanced in worldly experience and social wiles. Her letters breathe a reckless-ness of expression and a careless *exposé* of wish and desire which is more a criticism of those responsible for her train-ing than of herself.

She addresses a man fifty-one years old as "Billie" and boldly proposes marriage to him and invites suspicion upon her own motives by declaring that she is not mercenary but sentimental. It is not money, but love, which actuates her. Lastly, by the letter of April 22nd, she tells him that her

brother-in-law will be away on Wednesday night and that will afford them a good opportunity to go out together, and invites him to come and take advantage of it. In response to this he pays his last visit of April 24th and takes her driving to Cape Charles, returning by a circuitous way, reaching the Griffith home about ten o'clock P. M. She charged him with having forcibly accomplished his criminal purpose en route home, in the yard of an untenanted house, in his Ford coupe. She did not divulge this until some twenty minutes after she had gone to bed with her sister, Mrs. Griffith, who told her husband the next morning. Mr. Griffith took her at once to Parsons' home and charged him, in her presence, with having wronged the girl and demanded that he marry her or suffer the penalties of the law. Parsons denied the charge, saying that he had done nothing which bound or obligated him to marry her and he would not do it. The girl was mute at this interview.

A warrant was sworn out charging Parsons with having carnally known Grace Parker, a female under the age of sixteen years, by force, on the 24th day of April, 1929. Parsons was indicted and tried for rape before a jury of Northampton county, the late Judge N. B. Wescott presiding, and was acquitted. On November 9, 1929, Grace Rebecca Parker gave birth to a normal baby.

In July, 1929, civil action was instituted by the plaintiff, A. J. Parker, against Parsons charging him with being the author of the pregnancy of his daughter, Grace Parker, and claiming damages for the loss of her services in the sum of $50,000.00. Two trials of this case were had before juries, Judge Frank Armistead presiding at one, and Judge C. Vernon Spratley at the other, both resulting in the disagreement of the respective juries. On May 26, 1930, the immediate case was tried and the jury found the defendant not guilty. The plaintiff moved the court to set aside the verdict as contrary to the law and the evidence, which was heard

by the court and the motion was sustained, and the court, on the 23rd of June empaneled a jury, under the statute, for the sole and single purpose of assessing damages which they found to be $5,000.00. Thereupon judgment was entered and to this judgment a writ of error was awarded.

We are quite in accord with the position taken by counsel on both sides that the one question before us is whether the trial court's action in setting aside the verdict of the jury as contrary to the law and the evidence constitutes error.

It appears from the evidence that the defendant, Parsons, cared little for the society of women. Before he met Grace Parker he had not called on one for a decade. He was unlearned even in the ways of humble and simple society. In the matter of education the girl and he were about on a parity.

We have emphasized our conception of the effect of the letters of Grace Parker as illuminative of her character largely because her counsel have drawn a touching and pathetic picture of an innocent child in the hands of a lecherous and evil-designing man. Certainly there was a disparity between their ages but in other quite major respects he was no match for her. Verily she led him around by the nose. She employed the evil artifice of flattery with a dexterity worthy of one far in advance of herself in years. Of course all this may be true. By nature she might be just the kind of girl that her letters imply she is and still that would be no warrant for her seduction and debauchery and the perpetrator would be liable upon proof of the crime. Every instruction asked for by the plaintiff was granted and every instruction asked for by the defendant and objected to by the plaintiff was denied. Grace Rebecca Parker, the witness upon whose testimony far more than that of any other the plaintiff's case depended, admitted that she had testified before the examining magistrate and at the trial

of the defendant for rape, when his life was at stake, that no man had ever had sexual knowledge of her until the 24th of April, 1929. Yet in the immediate civil action she swore directly to the contrary. She wrote letters to the defendant as to the attitude of her sister and her brother-in-law in relation to him, and upon which information he finally acted in accord with her wishes, and then went upon the stand and said she had fabricated that part of her story.

This was the unfortunate attitude in which the girl's own testimony placed her before the jury. That of the defendant was in striking contrast. His denial was complete and his story was unshaken by the existence of any damagingly conflicting previous statements made. Eighteen of his neighbors, some of them prominent officials, some of them bankers, and others farmers, attested his good reputation for truth and veracity and affirmed that they would believe him on oath even though he were vitally interested. Three prominent physicians, who had made a physical examination of the defendant, testified. Two of them were local physicians, who had had post graduate work under Dr. Hugh Young of Johns Hopkins Hospital, Baltimore, Md., one of the leading genito-urinary specialists of America, and the other was a specialist of high repute in the same branch of medical work in the city of Norfolk. In the opinion of the two former, the chances of the capability of the defendant to become a father in the year 1929 were about one to ten, and in the opinion of the third (the specialist) they were nil.

Certainly there were damaging circumstances and testimony against the defendant, but the evidence was, beyond cavil, sharply conflicting. Doubtless the jury gave little credence to the testimony of the girl. If this was their position, there was abundant warrant for it. It was all before the jury. By consent of both sides they saw the infant itself. Doubtless they noted the testimony that invest-

ed them with the knowledge that the girl had been at the public school at Capeville and that she had to go to and fro with no companion at the Griffith home to accompany her. This latter is fairly to be presumed from the testimony. The burden was on the plaintiff to prove his case by a preponderance of the evidence, and the jury were properly instructed that it was not incumbent upon the defendant to point out the guilty agent. The jury evidently did not believe the testimony of the girl, and without it did not think that the plaintiff had carried the burden of proving his case. They were, we think, warranted in the conclusion reached by them; and the court erred in setting aside the verdict.

In the recent case of *Thress* v. *Hackler*, 155 Va. 389, 154 S. E. 502, 506, this court, through Mr. Justice Epes, said: "In passing upon a motion to set aside a verdict because the evidence is insufficient to sustain the verdict, the guiding principle for the court is not what it may think the jury ought to have done, or what the court may think it would have done had it been sitting as a jury in the case, but whether as reasonable men the jury could have found such a verdict upon the evidence. If this question can be answered in the affirmative, the verdict of the jury should be sustained.

"Applying these principles, we are of opinion the court erred in setting aside the verdict of the jury. The judgment of the court will be reversed, and final judgment here entered for the plaintiff on the verdict of the jury."

See also *Ricketts* v. *J. G. McCrory Co.*, 138 Va. 548, 121 S. E. 916.

We reverse the judgment of the trial court and enter final judgment for the defendant on the verdict of the jury.

*Reversed and final judgment entered.*