# Richmond

## L. B. TABB, ET AL., EXECUTORS, ETC. v. JULIA WILLIS, ET ALS.

January 15, 1931.

Present, Prentis, C. J., and Holt, Hudgins, Epes and Gregory, JJ.

*Tazewell Taylor* and *Lucian B. Cox*, for the appellants.

*W. M. Grant* and *Jas. G. Martin*, for the appellees.

HOLT, J., delivered the opinion of the court.

Mrs. Sallie W. Brickhouse, who had lived in Norfolk for many years, died there on September 23, 1928, childless and testate, leaving as her heirs and next of kin four sisters and the children of a dead brother. She was seventy-three years old and had been a widow for about seven years. Her estate was worth about $35,000, made up for the most part of residences in Norfolk.

The will, the validity of which is here questioned, bears date September 1, 1928. It gives to three nieces, the daughters of her sister, Mrs. Hudgins, all of her property of every kind and character, and nominates as her executors L. B. Tabb and W. B. Burgess. She gives them power to

convey her real estate and requests that they be permitted to qualify as her personal representatives without security on their official bond.

These executors did qualify before the clerk of the Circuit Court of the city of Norfolk on the 28th day of September, 1928. From that order of probate, Julia Willis, Nannie Hanby and Carrie Culpepper appealed, under the provisions of section 5249 of the Code. The appeal came on to be heard in due course. A jury was empaneled and returned, upon a proper issue, this verdict: "We, the jury, find that the paper writing in evidence, dated September 1, 1928, purporting to be the will of Sallie W. Brickhouse, is not the true last will and testament of Sallie W. Brickhouse, deceased."

Proponents asked that it be set aside as contrary to the law and the evidence. This the trial court refused to do, and entered judgment thereon, and to that judgment a writ of error has been awarded.

This case, like most will cases, turns upon the evidence, which here is voluminous. Its examination must be tedious but, of necessity, is unavoidable. We shall undertake to state it, in brief form, from the viewpoint of the several witnesses.

For the contestants it is said:

1. The testatrix never knew the contents of the will, not having read it, nor was it read to her.

2. The testatrix never requested the attesting witnesses to act as such.

3. The testatrix was not mentally capable of making the will.

4. The testatrix acted under undue influence.

As the case has developed, the issues drifted down to two major propositions—want of testamentary capacity and undue influence.

Both of the subscribing witnesses have testified.

Richard D. Ames had known Mrs. Brickhouse for about thirty-five years. He was an employee of a firm of insurance agents, and in this capacity saw her at her home two or three times a year. On these occasions she would sometimes talk with him about her property, its physical condition, and her rental agents. His last interview took place at her home on Boulevard avenue about sixty days before the will was executed.

On September 1st, Mr. Burgess came for him and together they called by for Mrs. Gay. Both of these parties had theretofore, at the suggestion of Mrs. Brickhouse, been asked by Mr. Burgess to act as testamentary witnesses. Together they went to the Burgess home where she was and to her room. Their stay was short. Mr. Ames spoke to her, and she asked after his wife. He told her the purpose of his visit. She replied "that was all right." She was then propped up in bed. Mr. Burgess produced the will; it was not read. She signed it, writing the last two letters of her name with the aid of Mrs. Gay, for she was nervous and her hand was shaky. When the execution was completed she observed that she was "glad it was all fixed." Mrs. Brickhouse was then perfectly capable of understanding a business transaction.

Mrs. Gay was also a subscribing witness. She had known the testatrix for twenty-three years and was her close friend. She went as a witness because Mrs. Brickhouse had sent for her. The message came through Mr. Burgess over the 'phone, who, accompanied by Mr. Ames, called in an automobile and took her to his home. Mrs. Burgess and Mrs. Tabb were both there, but not in the sick room, and a negro nurse present withdrew, leaving only the witnesses and Mr. Burgess. Mrs. Gay talked with Mrs. Brickhouse for a few minutes, who then seemed to be bright and cheerful and capable of transacting ordinary business.

The conversation seems to have been quite inconsequential, and in the main about a beautiful pet cat which belonged to her physician, Dr. Savage. Mrs. Gay did not read the will and signed on a line indicated to her by Mr. Burgess. Mrs. Brickhouse's hand was shaky and near the end of the signature she asked this witness to hold her arm. This will, in its provisions made for these nieces, confirms a purpose which the witness had heard the testatrix express two or three times before it was ever executed. Its formal execution is not in dispute.

W. B. Burgess married Helen Hudgins, a beneficiary and a niece of Mrs. Brickhouse. Before Mr. Brickhouse's death the Burgesses lived for a time with them, and for the past six years their homes were only a short distance apart. The relationship existing between her and her nieces, Mrs. Burgess, Mrs. Eaton and Mrs. Tabb, was very intimate, rather like that between mother and daughters than between aunt and nieces; indeed, she spent the major part of her time either in the Burgess or in the Tabb home.

Burgess himself was a design draftsman in the Norfolk navy yard, and had held a position there for something like twenty years. Mrs. Brickhouse was accustomed to consult him about her business, and in February, 1928, called him over to her home and told him that she wanted him to write her will. She said that she wished all of her property to go to her three nieces, naming them. She further said that she had discussed this with her husband, who also wished it (property acquired in major part from him) to go that way, and not to her sisters. He advised her to get some lawyer to do this work. She answered that her houses had not been rented and that she did not have money to pay a lawyer. Nothing was done, and in the following May she came over to the navy yard where he was, and again asked him to write her will. He again advised her to get a lawyer. She answered that if he

would prepare a memorandum and have it typewritten she would attend to its execution. He agreed to this. Witness was then ordered to Washington on official business, and held there from the 21st of May to the 4th of August. On August 10th or 11th testatrix called him over to her home and reminded him of his promise, and was then quite insistent. She further said that she wished him and Mr. Tabb to serve as executors. The question of a bond was brought up and she was told that one executed with security would cost something. It was then agreed that sureties might be dispensed with, and a memorandum, which was the basis of the will, was then written. A short time thereafter testatrix became quite unwell. Mr. Burgess insisted that she go to his home, and this she did. Because of the situation thus created, there was some further delay. He suggested to her that they wait until she was well enough to go back home. This was unsatisfactory to her and she seemed to be worried. In the end he promised to go ahead. The next day, more or less by chance, he came into town with Mr. Tabb and told him what had been done. Mr. Tabb suggested that he be given the memorandum that he might take it to Mr. Portlock who was an experienced draftsman. Burgess gave it to him; he took it to Portlock and on the next day returned to Burgess his original notes, the completed draft and a carbon copy. Soon thereafter he took them all to Mrs. Brickhouse. She read the will over carefully, thanked him for all that he had done, and asked him to get Mr. Ames and Mrs. Gay to act as subscribing witnesses. After the will was executed it was left with the testatrix but was soon afterwards taken away by Mr. Burgess. In some way the memorandum from which it was prepared and the carbon copy have been lost.

During all of these conversations which had preceded the execution of the will and at the time of its execution, Mrs.

Brickhouse's mind was perfectly clear. She knew what she wanted and the will, as drafted, conforms to her purposes as they had theretofore been expressed.

Mr. L. B. Tabb, a merchant in South Norfolk, is named as one of the executors, and is the husband of one of the beneficiaries. He had known Mrs. Brickhouse for twenty-five years and saw her frequently up to and during her last illness. She was a woman not easily influenced, mentally alert and amply competent to attend to business up to the last two or three days of her life; was frequently in his house, and was preparing to move next door when stricken down. She seemed particularly devoted to his wife and her sisters. This witness took the memorandum from Mr. Burgess to Mr. Portlock, who, when the draft was completed, gave it back to him together with a carbon copy and the memorandum. He read neither the memorandum nor the will and did not know their contents, nor did he ever mention to the testatrix the part he had taken in these transactions. He knew nothing about the execution of the will and does not remember asking Mr. Burgess if it were signed, giving as a reason for this want of curiosity that it was none of his business.

Mrs. E. F. Wyatt, of Pittsburgh, Pennsylvania, had, until four years ago, lived in Norfolk practically all of her life, and during a part of that time lived next door to Mrs. Brickhouse and knew her well. Their friendship dated back to a time when these nieces were but children, and were treated by the testatrix as her own. On July 22, 1928, she came to visit Mrs. Brickhouse, and remained with her until August 5th. On the occasion of this visit their intercourse seems to have been quite intimate. Before this she had told the witness on a number of occasions of her purpose to make these nieces her heirs, and on that visit this matter was frequently discussed. She said that she had asked Mr. Burgess to attend to her affairs but he seemed

reluctant to act and had put her off. She mentioned the fact that he was then in Washington and that she was anxious to have him come back "so that he could make out the will." Mrs. Brickhouse was a strong-minded woman, and on the occasion of this visit seemed to be her normal self. When asked what reasons controlled her in making her nieces her heirs, said: "She said—I asked her one day, when she was speaking of the disposition of her property, I asked her why it was that she made these girls her beneficiaries, the young ladies I have just mentioned, and she said that she had done a good deal for the others, and that her sisters and relatives on the Eastern Shore didn't need it and that she had already helped those in Norfolk frequently and she thought that was sufficient."

Miss Eva Duke has lived in Richmond for the past seven years and before then had lived in Norfolk and Portsmouth. She knew Mrs. Brickhouse intimately and had frequently visited in her home, her last visit being on August 9, 1928. At that time the testatrix's mental condition was very clear. She talked sensibly and said that she was preparing to move across the street that she might be "next door to her sister and these girls so if she was taken sick or needed anything day or night she could call out to them." Her relations with them were very cordial. They were to be her heirs. "I always heard her speak of all three of the girls, Edna, Helen and Margaret, and she told me when she died she wanted these three girls to have everything she possessed. Not only did I hear her say it, but I heard Mr. Brickhouse make the same remark, that he wanted those three girls to have what he left."

Col. Offner Hope, a retired army officer, was her tenant from July 19, 1923, until August 30, 1928, and saw her frequently. He gave up his house at her request, her reason as stated being that she wished to move into it that she might be next door to her nieces, and would not have

to cross the street to see them. It was her custom to visit the Tabb home daily where Mr. and Mrs. Eaton and Mrs. Hudgins, her sister, then lived. He last talked to her in the latter part of June, 1928. She appeared at that time to be in normal mental condition, was a strong-minded woman and not easily influenced. During a portion of the time that Col. Hope was her tenant, Tommy Willis was a frequent visitor in her home.

Mrs. Hattie Hayden Roberts had known Mr. and Mrs. Brickhouse well for many years. For something over two years she was a roomer in their home, and heard them speak of these nieces as their children. Mr. Brickhouse on one occasion thus expressed himself: "He had frequently talked with me, that if he should die first, he would leave his property to Mrs. Brickhouse and at her death it was to go to these three children." After his death and when Mr. Hudgins died, she heard the testatrix say: "She intended to leave her property to the three girls, and I asked if she was going to leave any to any other member of the family, and she said, no, that she didn't intend to leave any to the Willises, and that the Hanby children had enough to buy and sell her."

H. E. Smith was a real estate agent and had looked after Mrs. Brickhouse's property for about a year, and because of this relationship saw her quite often. He last saw her about two weeks before her death. On the occasion of this last visit, which must have been after the will was executed, testatrix appeared to this witness to be entirely capable of transacting business intelligently. She talked about the moving and questioned him as to what he had done. He had undertaken its supervision.

Mrs. Maude D. Belote was an intimate friend of Mrs. Brickhouse and had known her for forty-five years, although she had not seen her so frequently in the six or eight months which preceded her death. Mrs. Brickhouse

was a woman who knew her own mind. She was exceedingly fond of these nieces, and at one time wanted to adopt Mrs. Burgess. They, on their part, treated her with great consideration. She said to this witness that it was her purpose to give her property to these young ladies.

Mrs. Lilly Kelley, of Baltimore, had known the Brickhouse home since 1918, and had been a frequent visitor there. Both husband and wife appeared to be devoted to these nieces and looked upon them as their children, who in turn were devoted to them. This witness visited in Norfolk the latter part of August and spent from 7 to 9 o'clock on September 1st with Mrs. Brickhouse in the Burgess home. She was questioned as to her impressions of testatrix and about her mental vigor, and said: "She talked as rationally as I ever knew her to, and expressed her regret at not being able to entertain me during my visit, and to come back later in the winter when she was more settled in her home." She further stated that, in her judgment, it would have been impossible for anyone then to have induced Mrs. Brickhouse to make a will which disposed of her property in a way she did not want it to go.

Miss Lelia G. Travis is a sister sixty-eight years old, who has lived for the past five years in the Burgess home. As heir and distributee, she will take if the will is broken. She was not well and her evidence is in the form of a deposition. She states that the relationship between Mrs. Brickhouse and these nieces was unusually close and affectionate. In the summer of 1928 she heard her say to Mrs. Eaton: "I am saving for you three," and soon after the will was executed the testatrix told her that she had given everything she had to these three nieces, share and share alike. At that time her mind seemed to be entirely clear. She talked intelligently and about matters at large. She told Mrs. Willis that no provision had been made for her, and was troubled and in tears over the manner in

which Tommy had treated her. She was fond of him and he had come to see her in her last illness. It is true that he left without saying good-bye, but this was done on suggestion that leave-taking might be unwise.

Mrs. Mary Durbin had known Mrs. Brickhouse for nineteen years and had talked with her about a month before her death, maybe a little longer than this. At that time she seemed to be perfectly normal. She was a person who knew her own mind. "Everyone that she was connected with knew her wish was law."

Mrs. Offner Hope had known Mrs. Brickhouse for about five years. These Hopes moved from her house on the 30th of August, as we have seen. Just a short time before that she saw the testatrix at the Burgess home. They talked about the moving and about her health. She asked about the Hope children, and she spoke of the Hope baby, who had been to see her a short time before, and wished that she would come again. Her references to persons and things always conformed to the facts. She entertained warm affection for these nieces and talked of their unfailing care and affection. She seemed fond of Tommy Willis also, but in a lesser degree. She was a woman of decided opinions and could not be coerced at all.

Mrs. W. J. Shuster, another neighbor, saw her about two weeks before she died. She recognized her visitor, asked after each member of the family and called by name her two children whom she had not seen for two years.

Mrs. Paul Taylor, another neighbor, called on the 3rd or 4th of September. Mrs. Brickhouse recognized her, took her by the hand, said that she was ill and wanted her prayers. This witness thought her mind was then clear. At other times she had spoken to her of her love for these three girls.

Mrs. Hazeltine T. Chandler was a neighbor whom she often visited, the last visit being the latter part of June.

She spoke of these nieces and said: "They are like my own children." Later, and about the first of August, she spoke to her casually over the hedge and said she was not well. She was strong-minded and could not be moved from a position once taken.

Mrs. Annie C. Hohnakin was a friend of many years standing. The testatrix spoke to her many times about her purpose to give her property to her nieces, and as late as July 4, 1928, said: "She wanted them to have what she had. I spoke to her about going out and visiting and doing more with her money, and she told me that she wanted them to have what she had because Mr. Brickhouse wanted and she wanted her nieces to have what she had." Her mind on that occasion was "as good as it could be."

Mrs. Mettie Tabb, the mother-in-law of Mrs. Tabb, the niece, saw Mrs. Brickhouse three times during her illness at the Burgess home. She was then weak in body but sound in mind. Two years before then she had said to the witness: "We are saving what we possess for these nieces, Mrs. Tabb and her two sisters."

Mrs. Margaret S. Eaton, R. W. Eaton and Mrs. Edna E. Tabb testified along the same general lines as to the condition of Mrs. Brickhouse's mind when the will was executed. Mrs. Tabb stated that she wanted Burgess to prepare her will and was worried because he put her off. Mrs. Burgess said that upon several occasions before her last illness she, when sick, had come over to her home to stay.

Mr. L. B. Cox is an attorney. He stated that upon the day on which the will was executed Mr. Tabb asked him to come over and supervise its execution. He came, Mr. Burgess showed him the will, and he read it. The subscribing witnesses had not then been summoned, and he left to fill another engagement. He told them that if his services were later needed to call him.

Rev. J. T. Bosman was the minister in charge of Larchmont Methodist Church, and as such was Mrs. Brickhouse's pastor. He knew her well and called on her in the Burgess home half a dozen or more times during her last illness. Indeed, he states that he visited her almost every other day; that she gradually grew weaker, but that her mind continued clear until near the end.

Rev. R. E. F. Aler was a Baptist minister, and called upon her at the Burgess home upon the Saturday or Monday following Labor Day. On the occasion of this visit he remained with her fifteen or twenty minutes. They talked about matters both spiritual and temporal. She appeared to him then to be of sound mind and able to attend to business.

Dr. M. B. Savage was her physician. He visited her professionally on June 7, 1928, and on July 12th, 14th, 16th, 20th, 23rd, 29th and 31st, on August 2nd, 4th, 9th, 18th, 20th, 21st, 23rd, 24th, 25th, 27th, 29th, 31st, and on September 2nd, 3rd, 4th, 5th, 8th, 9th, 11th, 13th, 14th and 16th. Upon the occasion of most of these visits he talked freely with his patient. She spoke to him about her love for these nieces and said "that she cared more for them than the rest of the family put together." These "were her words." This witness saw her on the 31st of August and on the 2nd of September, and on neither occasion was there any evidence of mental deterioration and there was none until about September 12th. At that time he called into consultation Dr. Redwood, a mental and nerve specialist. He was called in the latter capacity.

Dr. F. H. Redwood has testified. He came into consultation on September 12th. She then answered his questions clearly and in his judgment was able to transact business with good intelligence.

Dr. M. P. Doyle had been her physician immediately following her husband's death, and had attended him in

his last illness. He went professionally to the Burgess home at a date somewhere between one and two weeks before Mrs. Brickhouse died. Her door was open and he dropped by for a little chat. The conversation was limited, but she spoke sensibly and left no doubt in his mind as to her mental status. He thought it good.

Dr. W. B. Martin, a graduate of, and at one time a resident physician at, Johns Hopkins, saw Mrs. Brickhouse on August 22nd. He found her suffering from a form of heart disease but in normal mental condition and able to attend to the ordinary affairs of life.

Dr. W. P. McDowell had been her family physician thirteen or fourteen years before she died. He testified that on one occasion "I had been called to attend Mr. Brickhouse early one morning before breakfast, and while in the bedroom during the conversation the question came up about their love of these nieces, and in that conversation they both, in the presence of each other, told me—I can't recall the exact words in which they told me, but led me to believe or told me at that time that these nieces, the daughters of Mrs. Hudgins, were their beneficiaries, or would be their beneficiaries."

Dr. C. L. Harrell saw the testatrix on September 4th, 6th, 12th, 18th, 19th, 20th, 21st and 22nd, having been called into conference on September 4th. He examined the patient carefully. "She was mentally alert and mentally clear at that time (September 6th), and told the names of all the physicians that had treated her."

For the contestants, Blair Stewart, a trained nurse, testified to the warm affection that Mrs. Brickhouse entertained for her sister, Mrs. Hanby, for Mrs. Rolley, and for other members of the family.

Joseph B. Ennis knew Mrs. Brickhouse well. She spoke to him about the fact that her sister, Mrs. Hudgins, had not been in the house for six years, and would cry about it.

She also said that she was glad Tommy Willis was coming back to her. He was under the impression that she was an object of charity.

Dr. W. W. Baxter had known Mrs. Brickhouse for thirty-five years and went to see her occasionally, sometimes professionally. He last saw her on April 26, 1928. She seemed to be fond of Tommy Willis and said that he was coming to live with her when he returned from the training school.

Hattie Williams, a colored nurse, was called in on the morning of the 1st of September and remained there until death occurred on the 23rd. During that time she never saw Mrs. Brickhouse read anything and never saw her put on her spectacles. She frequently called for Thomas Willis, and said she wanted him to come or it would be too late. She (the nurse) knew nothing about the execution of the will. From the 1st of September on, this nurse fed her patient with a spoon, this because her mouth was sore. She was questioned on cross-examination and testified to this effect:

"Q. Would she talk to you from time to time?

"A. Yes, sir; she certainly did.

"Q. Did she talk intelligently?

"A. Yes, sir.

"Q. You understood what she was saying?

"A. Yes, sir; she was rational.

"Q. She talked to you like a rational person?

"A. Yes, sir; she was rational.

"Q. How long did that rational condition continue?

"A. Of course, Mrs. Brickhouse, at the very last, a couple of days before she died, she was unconscious like thousands of people is before they die.

"Q. She continued to be rational until a few days before her death?

"A. Yes, sir."

C. C. Carper put in an oil furnace for Mrs. Brickhouse in

1924. She told him that she depended upon Willis to look after her interests, and he did look after this work when it was done.

T. C. Willis, a nephew, testified as to the friendly relationship which existed between his family and that of the testatrix. He told in detail of her manifestations of affection for him and of help that she had at times given him. He gives an account of his last interview on September 12th, and tells why leave-taking was omitted. It was to keep from distressing her, and for that reason he stated that he was going to the dentist. She did not believe him. As he kissed her good-bye, she said: "Tommy, if anything happens to Aunt Sallie you are well cared for."

Floyd Hearst also sold her an oil burner. Willis arranged about the purchase. Mrs. Brickhouse said to him "that she had to depend on Mr. Willis because she had no one she could depend on like him. She practically raised him * * *. I believe at one time she referred to when he was quite young that she wanted to adopt him but his parents objected to her adopting him legally."

Mr. Portlock drew the will at the request of Mr. Tabb who is a man of high character. This will was drawn in accordance with the written memorandum then furnished. It, together with a carbon copy and the original memorandum, was given back to Mr. Tabb, and that is all that Portlock knows about it.

A. P. Hanby, a nephew, has testified as to his aunt's affection for Tommy Willis and for all of her sisters. He mentions that upon one occasion Tommy's father corrected him. Mrs. Brickhouse intervened and said: "Willie, Tommy is mine; you have given him to me, and before you shall whip him any more you shall walk over my dead body."

Mrs. Willis has testified as to the steadfast love of her sister for Tommy. During Christmas, 1927, she saw her in the home of her daughter, Mrs. Kelley.

"She was crying, as usual. It seemed to me that she lived in tears. She was crying and saying how the girls were so cold towards her and that she lived such a lonely life by herself. I mean that she lived by herself for six years, and she said: 'Julia, I have stood it until I believe I can't stand it.' She kept talking about how little they cared for her and how little they looked after her. She said: 'You know, Julia, they need not think that they will get all of my property; they will never do it, not the way that they treat me, and as for Margaret Hudgins, I would sooner leave my property to the orphans in Richmond. She shall never heir any of my property, and when my will is read there will be some that will be greatly surprised, and as disrespectful as Margaret Hudgins is to me.' "

When Tommy was a little boy, testatrix said to him: "Bless your little heart, your Aunt Sallie will never forget you; she will take care of you before she dies."

On September 6th, Mr. and Mrs. Tabb told her of her sister's illness. On the same morning she got a letter from Mrs. Burgess confirming this, and said that her sister wanted to see her. She came on the 15th. Immediately upon arrival the sister asked her about Tommy and if he had come also. She was then in a most distressing physical condition. She further testified in part as follows:

"Q. Did you not say to Mr. Eaton last summer, and in the presence of Mrs. Eaton and Mrs. Tabb, Mr. Eaton and Mr. Tabb, that Mrs. Brickhouse had told you that she was not going to leave either you or any of your children anything?

"A. No; because I couldn't truthfully say it. She gave me no cause to have that feeling and I didn't say it."

Mrs. C. W. Rolley, niece, and daughter of Mrs. Hanby, testified that her aunt loved Tommy and herself devotedly, and that her relations with the Hanby family were very close and cordial. She saw this aunt in August and gives this evidence as to her condition:

"Q. What was the condition of your aunt, Mrs. Brick-house, when you saw her on the 28th and 29th of August, 1928?

"A. She was ill—very, very ill.

"Q. Was she fit, at that time, to read or to talk intelligently?

"A. Not while I was in her presence.

"Q. How long were you in her presence?

"A. All of the two days that I could possibly be with her."

After testatrix's death this witness asked Mrs. Burgess: "Where was she when she made her will?" The answer was: "Over to her home." She further asked who read the will over to decedent, and was told that Mr. Cox did.

Mrs. A. P. Hanby went to see Mrs. Brickhouse in the latter part of August, 1927 (manifestly a mistake as to time), and found her crying. She said she was sick, and when asked why she did not get Mrs. Eaton to stay with her, answered: "She is too disrespectful and I wouldn't leave her anything if I had to give it to the Salvation Army." She further testified that Mrs. Burgess said: "Aunt Sallie is too mean to live."

Mrs. Emma S. Kelley is Mrs. Willis' daughter. She said that between Mrs. Brickhouse and all of the Willis family the relations were very affectionate. We have seen that there has been some evidence as to what Mr. Brickhouse wished done with their property. On that subject she said: "I never heard her say how she wanted it left, but she told me Mr. Brickhouse told her on Friday and he died on Sunday, and he said: 'I would like you to get your business fixed up; we can never tell how long we will live,' and he was not feeling so well. He said: 'I would like for you to make your will,' and she said: 'Don't talk that way.' He said: 'Dear, I would like for you to take care of Ellen'—that is, Mrs. Ellen Moore—'I would like for you

to take care of Ellen, Lelia'—Mrs. Brickhouse's maiden sister—'Lelia, I am sure you will take care of her. Tommy'—that is my brother, Mr. Willis—'we have always claimed as our boy, and I would like for you to take care of Junior,' that is Mrs. Tabb's little boy; he was specially fond of him. She said: 'Darling, Junior will never need it; his parents have enough for him,' and he said: 'Suit yourself.'"

She visited her aunt on September 16th, and found her then irrational, and laboring under hallucinations.

Mrs. Nannie T. Hanby, a sister, has also testified. She tells of the affectionate relations existing between her family and her sister. She visited her sister in June, 1928. She was then failing, and, as the witness expresses it, "lived in tears." She complained that the Hudgins nieces had grown cold towards her; said that she was going to leave Margaret Eaton nothing, and that they would be surprised when they read her will, and said: "She always, for the last years, would express herself that way; that the girls were growing colder and colder in their love towards her. It seemed that the lonelier she was and needed their love the less that she got of it. She was alone all the time unless some one went to see her. I stayed with her over three weeks at that time and I never saw one of the girls. In fact I will tell you the truth. I never saw one visit her after she moved to that house in my life. I never did. I don't say that they didn't, but I never saw one. She said, while I was sitting there one day, she was crying, and Margaret came out of the door, and she said: 'Oh, I believe that child despises me; I don't know why but,' she said, 'Margaret has turned completely against me, and,' she said, 'I am going to tell you right now, I never intend to give Margaret Hudgins another dollar as long as she lives, and she surely shall not have one penny after I am dead.' She said: 'I will leave my property to the orphanage home in

Richmond or anywhere sooner than I would give it to Margaret Eaton. She shall not have it—she shall not profit by my money'."

On the occasion of this visit witness advised that a physicain be sent for and Dr. Savage was called in; he then suggested that the sick woman should not remain in her house alone.

Witness did not see her sister again until the 28th of August. She could scarcely recognize her. "Oh, that awful wild startled look and emaciated face. It didn't look like my sister Sallie, no." She was then irrational and spoke of having walked about the country all night looking for a place to stay.

There had been two trials, and this witness had testified at the first. At that time she made no mention of her sister's insane delusions.

Mrs. Burgess, recalled, in reply to Mrs. Willis' evidence, said that the memorandum for the will was written at Mrs. Brickhouse's home, and that she had that in mind when she said the will was written there. She further said that Mr. Cox did come to read the will, but she did not state that he had read it to her aunt.

██ We have to deal with a jury's verdict, approved by the trial court. So stamped, it is entitled to the utmost consideration, but under section 6363 of the Code it does not come to us as on a demurrer to the evidence.

In *Shoemaker* v. *Andrews*, 154 Va. 170, 152 S. E. 370, 373, Prentis, C. J., cites with approval this statement of the law from *Vandenbergh and Hitch, Inc.* v. *Buckingham Apartment Corp.*, 142 Va. 397, 128 S. E. 561: "While the court might be compelled to accept evidence given by the plaintiff on a demurrer to the evidence by the defendant, yet, under this section (6251) and section 6363, such evidence need not be accepted, when to do so would strain the credulity of the court, and require the entry of a judgment contradicted by

every other fact and circumstance of the case. It is extreme cases of this sort that the statute was enacted to meet."

■ In *Norfolk Southern R. Co.* v. *Hudgins*, 150 Va. 227, 142 S. E. 409, 411, it is said: "While we adhere to the rule of decision as to the weight that should be given to the verdict of a jury upon a conflict of the evidence, we are of the opinion that the language placed by the revisors in section 6363, 'unless it appears from the evidence that such judgment is plainly wrong,' should not be held to be meaningless."

In *Meade* v. *Saunders*, 151 Va. 641, 144 S. E. 711, 712, Judge McLemore said: "This case is before us as the result of the exercise by the court of the power conferred by section 6251, and while the principles of law to be applied by the appellate tribunal under such circumstances are analogous to those controlling demurrers to evidence, they are not entirely the same. Where it can be seen from the evidence as a whole that the verdict has recorded a finding in plain deviation from right and justice, the court may, indeed should, set it aside." See also *Flannagan* v. *Mutual Life Ins. Co.*, 152 Va. 38, 146 S. E. 353.

In *Norfolk & Western Ry. Co.* v. *Thayer Co.*, 137 Va. 294, 119 S. E. 107, 108, the court, in commenting upon section 6363, said: "It was intended to meet exceptional cases where the verdict and judgment were plainly wrong and injustice was done because there was some evidence in favor of the verdict and judgment, though entitled to little weight, but the judgment could not be disturbed on account of the strict and somewhat technical enforcement of the rule 'as on a demurrer to the evidence.' "

■ In dealing with the power of courts over verdicts, and particularly with the power of this court over a verdict approved by the trial judge, we have not lost sight of the distinction between a verdict so approved and one disapproved by the court below. When the verdict has been

approved it is our duty to uphold it, save in exceptional cases and when it appears to be plainly necessary to prevent injustice. We cannot undertake to interfere merely because, in our judgment, the jury ought to have reached a different conclusion.

Undue influence is a species of fraud. He who alleges it must prove it by clear and satisfactory evidence. *Core* v. *Core's Admrs.*, 139 Va. 1, 124 S. E. 453.

"Before undue influence can be made the ground for setting aside a deed, it must be sufficient to destroy free agency on the part of the grantor; it must amount to coercion—practically duress. Suggestion and advice, addressed to the understanding and judgment, do not constitute undue influence, nor do solicitations, unless the party be so worn by the importunities that his will gives way. Earnest entreaty, importunity and persuasion may be employed, but if the influence is not irresistible it is not undue, and its existence is immaterial, even though it is yielded to. *Greer* v. *Greer*, 9 Gratt. (50 Va.) 330, 333; *Orr* v. *Pennington*, 93 Va. 268, 24 S. E. 928; *Hammond* v. *Welton*, 106 Mich. 244, 64 N. W. 25; *Hamilton* v. *Smith*, 57 Iowa 15, 10 N. W. 276, 42 Am. Rep. 39. To set aside a deed for undue influence, it must be shown to the satisfaction of the court that the party had no free will, but stood in *vinculis*. *Conley* v. *Nailer*, 118 U. S. 127, 6 S. Ct. 1001, 30 L. Ed. 112." *Jenkins* v. *Rhodes*, 106 Va. 569, 56 S. E. 332, 334; *Jenkins* v. *Trice*, 152 Va. 411, 147 S. E. 251.

There is no evidence here which can, by fair implication, be said to support any such charge, nor is it supported by circumstances of evidential value.

It is true that when the will was signed Mrs. Brickhouse was in Mrs. Burgess' home, but she was there because she lived alone and did not wish to remain in her own home when unwell. She went to her niece's home as she had done on several previous occasions under the same conditions.

Mrs. Willis herself had previously suggested to Dr. Savage that she should not continue to remain in her home alone when unwell.

Moreover, after she moved, every relative had unimpeded access to her, a privilege freely exercised. When she appeared to be worse on September 6th, Mrs. Tabb, who was then in Washington, saw Mrs. Willis, who was also there, and suggested that they go down together to see her sister. On the same day, Mrs. Willis received a letter from Mrs. Burgess, telling her how unwell Mrs. Brickhouse was, and how much she wanted to see her, but for satisfactory reasons she did not then go, and did not go until the 15th of September. It is inconceivable that these beneficiaries should have been plotting to defraud their kinspeople and to coerce the testatrix, and were at the same time urging them to visit her. Internal evidence of the absence of any such malign influence rests in the fact that the will, as actually written, conforms to a purpose time and again expressed by Mrs. Brickhouse to disinterested witnesses. That she was a woman not easily influenced is not in dispute.

Was she of sound mind and disposing memory on September 1, 1928? Undoubtedly at that time she was seriously ill. She was weak, emaciated and emotional, and would sometimes weep for no apparent reason. Her heart and kidneys were affected, and she probably suffered from hardening of arteries.

██ Neither sickness nor impaired intellect is sufficient, standing alone, to render a will invalid. If at the time of its execution the testatrix was capable of recollecting her property, the natural objects of her bounty and their claims upon her, knew the business about which she was engaged and how she wished to dispose of her property, that is sufficient. Moreover, those who would impeach a will on the ground that the decedent had become incom-

petent must clearly prove that incompetency to exist. *Parramore* v. *Taylor*, 11 Gratt (52 Va.) 220; *Huff* v. *Welch*, 115 Va. 74, 78 S. E. 573; *Portner* v. *Portner*, 133 Va. 251, 112 S. E. 762; *Smith* v. *Ottley*, 144 Va. 406, 132 S. E. 512; *Kachline* v. *Clark*, 4 Whart. (Pa.) 320; *Temple, etc.*, v. *Temple*, 1 Hen. & M. (11 Va.) 476.

If this testatrix could make a good will on September 1st, we need not concern ourselves about her condition at some later time. For the purposes of this case, we may assume that she was fond of the contestants and of all her kinspeople, and further that at times she was irritated with the proponents, and we may put aside their testimony in every instance in which there is any conflict, and in every other instance except where it is overwhelmingly corroborated. No witness for contestants has testified as to capacity on September 1st. The evidence of two of them deals with the situation immediately before that time, or about the 28th and 29th of August, and so should be carefully considered. They are Mrs. Nannie T. Hanby, a sister, and her daughter, Mrs. C. W. Rolley. Their evidence, once stated, need not be restated. Mrs. Hanby testified when this case was first tried, but her evidence did not cover that particular point which makes it important now. When we look at Mrs. Rolley's evidence, which was that her aunt was "not fit at that time to read or talk intelligently," it will be seen that she was testifying as to a situation two or three days before the will was signed. As against this we have the testimony of subscribing witnesses. They are the subjects of a vigorous attack, and are charged with knowingly participating in a fraud. It should be conceded that they might have examined with more care into the condition of the testatrix, but they were inexperienced in such matters and saw no reason to do so. They had been sent for to witness the will. They went and found the testatrix ill and propped up in bed.

They announced the purpose for which they had come. The will was produced; the testatrix in signing it asked Mrs. Gay to steady her arm, and this she did. When it was over Mrs. Brickhouse said that she was "glad it was all fixed." They did not read the will and few subscribing witnesses do. They merely appeared at the request of the testatrix, and withdrew when they had done all that they had been asked to do. It is also said that the will was never read by her, and a nurse who came there on the 1st of September testified that she read nothing from that time on. Mr. Burgess has stated that she read it over carefully on the preceding night, and he is twice corroborated, once by Miss Travis who was told what provisions were there written, and by the will itself, because it accords with her previously declared intention proved by a host of disinterested witnesses.

Mrs. Kelley spent two hours with her the night of the day on which it was signed. She then saw nothing indicative of incapacity. Dr. Savage, her family physician, saw her about every other day during her illness. He saw her on August 31st, and on September 2nd. Nothing appeared to be the matter then. Dr. Harrell saw her on September 4th. Two or three other doctors saw her along about that time, generally speaking. With one accord they say she was entirely capable, and in this they are sustained by her friends and neighbors, her tenants and her rental agents; by her pastor and by a friend who was a Baptist minister, and by her nurse. All of them are disinterested, and if they do not prove that Mrs. Brickhouse had mentality sufficient to execute a will on September 1st, then human testimony is worth little. Mr. Willis did say that his aunt, on September 12th, told him that he had been provided for. If we give to this full credit, it does not prove that she labored under any hallucinations on the 1st of September, and it is more than probable that

her mind was weakened during the last one or two weeks of her life; nor is the situation changed because Mrs. Emma Kelley has said that her aunt, on September 16th, labored under hallucinations.

■ As we have elsewhere observed, will cases are not particularly helpful as controlling authorities when they turn upon matters of fact rather than upon matters of law.

*Thornton* v. *Thornton's Ex'ors*, 141 Va. 232, 126 S. E. 69, 72, is in point as authority to show the power of this court over a verdict approved below. This court, in reversing that judgment, said: "To permit this verdict to stand would be to ignore long and well established doctrines, and to substitute the judgment of the jury for the will of the testator, and this without evidence to justify such a conclusion."

In *Huff* v. *Welch*, 115 Va. 74, 78 S. E. 573, 579, it appears that at the first trial there was a hung jury, as was the case here. At the second trial the jury found against the will. It was affirmed below, and this court set that judgment aside on an appeal. Citing from *Young* v. *Barner*, 27 Gratt. (68 Va.) 96, it commented upon the high respect which should be paid to such a judgment, but said: "When there has been a plain and palpable deviation from the proof, interference on the part of the appellate court is warranted."

*Culpepper* v. *Robie*, 155 Va. 64, 154 S. E. 637, is cited to support contestants. That case, to a large extent, turns upon its facts and so is not controlling here.

■ One man should not dictate, change or annul another's will either in court or out. The preservation of the privilege of making one's own will brings to the old and helpless a consideration which might not otherwise always be extended to them, and should not be whittled away.

For reasons stated, the will of September 1, 1928, must be upheld, and it is so ordered.

*Reversed.*