## CIRCUIT COURT OF FAIRFAX COUNTY

Nathan C. Jeffries,
Administrator of the
Estate of
Virgil H. Jeffries

     v.

Ann Jeffries Thaiss et al.

Case No. (Chancery) 174854

In re Estate of
Virgil H. Jeffries

Case No. (Fiduciary) 67600

July 31, 2002

BY JUDGE ROBERT W. WOOLDRIDGE, JR.

On April 14, 1994, Virgil H. Jeffries and Andella Jeffries executed a deed of gift of real estate to their daughter, Ann Jeffries Thaiss, and son-in-law, Christopher J. Thaiss. Under the terms of the deed, Mr. and Mrs. Jeffries retained a life estate in the property. On the same occasion, Mr. and Mrs. Jeffries executed separate wills. The deed and wills were signed in the offices of an attorney, Jean Galloway. Mr. Jeffries was himself a retired attorney. Mr. Jeffries died on December 7, 2000. Contending that Mr. Jeffries died

intestate, Nathan C. Jeffries ("Administrator"), brother of Mr. Jeffries, qualified before this court in September 2001 as administrator of the estate of Mr. Jeffries.

Chancery No. 174854 is an action brought by the Administrator to invalidate the deed on the grounds that Mr. Jeffries was incompetent at the time he signed it. Fiduciary No. 67600 is a petition by Mr. Thaiss to set aside the appointment of the Administrator, admit the will to probate, and appoint him as executor of Mr. Jeffries' estate. Ms. Thaiss opposes the petition by Mr. Thaiss; alternatively, she asks to be substituted for the Administrator should a change of personal representative of Mr. Jeffries be ordered by this court.

Underlying both of these proceedings is a divorce action filed by Ms. Thaiss against Mr. Thaiss in May 2000 and still pending before this court.

### Evidence Regarding Capacity of Mr. Jeffries

As to Mr. Jeffries' testamentary capacity to execute a will and mental capacity to execute a deed in April 1994, I make the following findings. By the early 1990's, Mr. Jeffries had suffered some cognitive impairment. His family doctor, Dr. Tralka, a specialist in internal medicine, referred him in 1990 to a neurologist for examination. Dr. Tralka did not refer his patients lightly to neurologists, rather only when their condition was severe. That neurologist confirmed Dr Tralka's opinion that "something was wrong" with Mr. Jeffries' brain. The neurologist determined that Mr. Jeffries had likely suffered a stroke or was suffering from a tumor, lesions, Alzheimer's disease, or dementia. In 1992, Dr. Tralka referred Mr. Jeffries to a second neurologist, who conducted a MRI and found lesions on Mr. Jeffries' brain. That neurologist diagnosed Mr. Jeffries as suffering from dementia, with thinking and memory problems.

In the summer of 1992, Mr. Jeffries set out to drive from his Vienna home to his regular dentist in Reston, a trip of but a few miles that he had been making for nearly ten years. Instead, Mr. Jeffries got lost and ended up over fifty miles away in Frederick, Maryland, where the police called his family, who came and retrieved him.

In December 1993, Dr. Tralka administered a test to Mr. Jeffries called the clock test, in which the patient is asked to draw a circle to represent a clock, put numbers on the clock face, and add hands to reflect a particular time. Mr. Jeffries failed to complete the circle and was unable to draw

numbers or hands on the face of the clock. Dr. Christine Chang, a geriatric specialist with the Veterans Administration, testified that the clock test is a test to diagnose and measure dementia and one that is peer reviewed, accurate, and generally accepted and relied upon by practitioners to assess cognitive abilities. Mr. Jeffries scored two out of ten points on the clock test, indicating cognitive deficits and advanced dementia. Both Dr. Tralka and Dr. Chang testified that such a condition would only worsen, not improve.

Beginning in late 1993, Dr. Tralka prescribed Cognex for Mr. Jeffries. Cognex is a drug sometimes given to patients in the early stages of Alzheimer's that may delay the advancement of the disease or improve cognitive ability. Ms. Thaiss advised Dr. Tralka during 1993 and 1994 that the Cognex was having a beneficial effect and that Mr. Jeffries' cognitive skills were improving. Dr. Tralka testified at trial that he believed the dementia suffered by Mr. Jeffries was not Alzheimer's, and therefore Cognex would have no effect on Mr. Jeffries' condition. He said he prescribed Cognex to Mr. Jeffries only to appease the family. I offer no comment on the medical ethics of prescribing medication under such circumstances.

Dr. Chang never examined Mr. Jeffries and testified solely based on her review of his medical records from 1990 forward. She testified that by the early 1990's Mr. Jeffries had receptive aphasia. That condition enabled him to read words but made it hard for him to understand those words, process thoughts, and verbalize. Dr. Chang believed that Mr. Jeffries did have Alzheimer's disease. Dr. Chang and Dr. Tralka both opined that, in April 1994, Mr. Jeffries would have been unable to understand and conceptualize matters like signing a deed or will.

Ms. Donna Maglione is a registered nurse and was director of the Leewood Adult Day Care facility where Mr. Jeffries enrolled in August 1994. She testified as an expert in geriatric care that, in August 1994, she found Mr. Jeffries impaired, having "word finding problems," and needing "verbal cueing" on routine matters.

Mr. Jeffries' family was clearly aware of his condition. Even Mr. Thaiss acknowledged (by deposition testimony introduced at trial) that, by April 1994, Mr. Jeffries suffered from speech difficulties and memory loss, had difficulty remembering words, and got lost driving. If Mr. Jeffries' family believed he was not competent to make a will or sign a deed in April 1994, they did not share that view with Ms. Galloway.

Brian McCormack, an attorney and family friend, referred Ms. Thaiss to Ms. Galloway in early 1994. Ms. Galloway testified that Ms. Thaiss advised

her by phone that Mr. Jeffries was suffering from mild Alzheimer's and that he was taking and benefiting from Cognex. From her familiarity with geriatrics as an elder law attorney, Ms. Galloway believed that Cognex enabled early Alzheimer's patients to think, function, and act normally. A note in the file of that call reflects that Mrs. Galloway was told that Mr. Jeffries had "serious memory problems and declining capacity." Mr. and Mrs. Jeffries and Mr. and Ms. Thaiss came to Ms. Galloway's office in February 1994. One of them filled out a "new client" form that included a section on any disability, but the family provided little response there. Ms. Galloway testified that Mr. Jeffries seemed "perfectly normal." Ms. Galloway (who had never previously met the parties) went over much of the information provided on the form with both Mr. and Mrs. Jeffries. She had Mr. Jeffries verify assets and income. Mr. Jeffries said Mr. Thaiss now did their taxes. Both Mr. and Mrs. Jeffries were adamant about giving their home to Ms. Thaiss. They said they knew Mr. Jeffries had Alzheimer's disease and likely would only get worse. Mr. Jeffries specifically said his daughter should get the house. Because they trusted her so, they wanted to deed it to her then and there. Ms. Galloway discouraged that step and suggested alternatives to accomplish their goals while protecting themselves. Ms. Galloway discussed various options with them, including how best to avoid any Medicaid liens. Although Mrs. Jeffries did most of the talking for the couple, Ms. Galloway testified she was careful to turn to Mr. Jeffries regarding the deed and ask if he agreed. Mr. Jeffries did so either verbally or by nodding his head. Ms. Thaiss was insistent that the property should go to both her husband and her. Both Mr. and Mrs. Jeffries said that whatever their daughter wanted was fine by them. The meeting lasted about two and one-half hours.

Ms. Galloway recorded in a post-meeting note to the file that there were moments when she had some doubts that Mr. Jeffries was following everything that was said. She noted that "in the beginning, I felt quite sure that he was totally with it, but then as time went on he seemed to be less cognizant of the full extent of the things that were being said." Ms. Galloway testified that by "less cognizant" she meant not paying attention or not fully alert, but that he was that way only for the last hour of the meeting. She testified that he was alert during the first portion of the meeting when the deed, will, medical directives, and power of attorney were discussed. Ms. Galloway testified that Mr. Jeffries was very specific with her about what he wanted and that he wanted the same provisions of his old will (which differed slightly from Mrs. Jeffries' will). She believed that he seemed to understand what was being discussed. She pressed Mr. Jeffries to be sure he understood

what was said and used simpler words when that appeared necessary. After the meeting, Mrs. Galloway prepared drafts of the documents and sent them to the parties to review. Ms. Thaiss called back and said Mr. Jeffries wanted to change the draft of his will to give one-half of his estate to the Thaiss children and one-half to Mr. Thaiss in the event Ms. Thaiss predeceased Mr. Jeffries.

Ms. Galloway testified that she did not recommend a guardian ad litem for Mr. Jeffries at or following this first meeting because she did not believe that one was needed. She testified that she recognized she had a strong ethical duty to be sure her client was competent to sign a will and a deed and that she cannot do meaningful estate planning with an incompetent client.

On April 14, 1994, Mr. and Mrs. Jeffries returned (along with Ms. Thaiss) to sign the deed, wills, medical directives, and powers of attorney. Ms. Galloway testified that she follows a specific routine when she has clients sign wills and that, without doubt, she followed that routine in this instance. Under that routine, she reviewed all the documents with Mr. and Mrs. Jeffries. Upon satisfying the clients and herself that the documents were in order, she asked two witnesses and a notary to come into the room. She then asked Mr. Jeffries if this was his last will and testament, if it disposed of his property the way he desired, and if he was under any influence or pressure to sign it. Following an affirmative response, she had him sign the will in front of the witnesses and the notary, who then notarized it. She did the same with Mrs. Jeffries for her will. Ms. Galloway had the parties sign the deed. She could not remember whether the deed or the will was signed first.

At either the February or April meeting, Mr. Jeffries said he did not want his life prolonged by artificial means.

### Other Evidence

The testimony of two additional witnesses warrants particular mention. First, I have placed little reliance on the testimony of Ms. Thaiss. Although she was in a natural position to offer evidence to help the court decide her father's competency, I cannot rely on her testimony for a variety of reasons. Ms. Thaiss arranged for the appointment for her father with Ms. Galloway and took him to her to execute the will and deed. Her conduct throughout suggested to Ms. Galloway that she believed her father had the capacity to make those decisions. She actually assisted her father in signing the documents at Ms. Galloway's office. She now asserts that her father did not even know his own name or address at the time.

In 1994 and 1995, Ms. Thaiss (trained as a registered nurse) represented to several physicians that her father was much improved as a result of taking Cognex. She wrote to Ms. Galloway asking for her help in maintaining insurance coverage for the Cognex prescription on the basis that the drug was helpful in treating mild to moderate Alzheimer's patients and that the drug was making a positive difference in her father's behavior. She asked Dr. Doerman to intervene for the same reasons. She testified at trial that she asked Dr. Doerman to misrepresent the benefits Cognex was providing her father.

In December 1994, Ms. Thaiss called Ms. Galloway with questions about her parents' state tax return. They also discussed the transfer of stocks from her father's name and how this might be accomplished. Ms. Galloway told her to have Mr. Jeffries sign the state tax return and deposit it. Ms. Galloway testified that Ms. Thaiss told her that Mr. Jeffries was still capable. At no time in this conversation did Ms. Thaiss suggest that her father was incompetent then or had been incompetent in April 1994.

In October 1999, Ms. Thaiss again consulted Ms. Galloway. She advised that she and her husband were getting a divorce, and she wanted to know how the property that was deeded to them jointly in 1994 might be returned to her mother, or how she might get her husband's name removed from the deed. Ms. Thaiss made it clear that the intention was to deed the property to her, with her mother retaining a life estate. She had Ms. Galloway prepare a quitclaim deed for her to present to her husband. In that conversation, she never expressed to Ms. Galloway that her father had been incompetent when he signed the deed.

I have no doubt that throughout these years, Ms. Thaiss has acted in the best interests of her father. She has been actively involved in his care and comfort. But Ms. Thaiss' potential interest in the outcome of this litigation, coupled with the inconsistent positions she has taken regarding her father's capacity, lead me to give little weight to her testimony regarding his competency in April 1994.

The second witness bearing mention is Brian McCormack. Ms. Thaiss had contacted Mr. McCormack in early 1994 and was referred by him to Ms. Galloway for estate planning. After Mr. Jeffries died, Ms. Thaiss again contacted Mr. McCormack. Mr. McCormack testified that he spoke with Ms. Thaiss, Mr. Jeffries' brother, and Mrs. Jeffries' counsel (in an action to set aside the deed, which was later nonsuited).[1] Based on those conversations and

---

[1] At the time of trial, Mrs. Andella Jeffries was not a party to either of these proceedings. She had been subpoenaed by Mr. Thaiss to testify. The Administrator's

his review of the medical records, he found it "well-grounded in fact" that Mr. Jeffries was not "cognizant" in April 1994. He assisted Mr. Jeffries' brother in completing the appropriate papers with the clerk's office to qualify as administrator of the estate. Those papers included a requirement that Mr. Jeffries' brother swear under oath that Mr. Jeffries died intestate. Mr. Jeffries' brother testified that he had no knowledge of the April 1994 will when he qualified as administrator. Mr. McCormack was well aware of the existence of the will.

It was not up to Mr. McCormack to determine Mr. Jeffries' competency as of April 1994. That was and is an issue for this court to decide. Mr. McCormack had no basis to direct Mr. Jeffries' brother to sign qualification papers indicating that Mr. Jeffries died intestate. Whether Mr. Jeffries' will was valid or not was a decision for this court to make. Mr. McCormack clearly should have advised Mr. Jeffries' brother of the existence of the April 1994 will and should not have seen to the qualification of an administrator of an estate before a court determined the validity of a known will.

### *Validity of a Will*

In a will contest, the proponent of a will has the burden of proving testamentary capacity by a preponderance of the evidence. Proof of compliance with the statutory requirements for valid execution of a will creates a presumption of testamentary capacity. Once that presumption arises, the will contestant has the burden of rebutting that presumption by introducing evidence of testamentary incapacity. The burden of persuasion remains with the will proponent. *Gibbs v. Gibbs*, 239 Va. 197, 387 S.E.2d 499 (1990).

Testamentary capacity is the degree of mental capacity required for the valid execution of a will. That capacity exists if at the time of execution of the will the testator "was capable of recollecting [his] property, the natural

---

counsel moved to quash that subpoena at the beginning of the trial on the grounds that Ms. Jeffries was very infirm and that she had no testimony to offer regarding matters before the court. I asked Mr. Thaiss' counsel to proffer what Ms. Jeffries' testimony would be and how it would be relevant to issues before me. Mr. Thaiss' counsel had no satisfactory response. Therefore, I granted the motion to quash the subpoena. After taking the cases under advisement, I concluded that as co-grantor on the deed, Mrs. Jeffries was a necessary party to the chancery proceeding. I directed counsel to make her such a party, and an order was entered without objection doing so.

objects of [his] bounty and their claims upon [him], [and] knew the business about which [he] was engaged and how [he] wished to dispose of [his] property." *Tabb v. Willis*, 155 Va. 836, 859, 156 S.E. 556 (1931).

*Validity of a Deed*

The law in Virginia governing the validity of deeds was set forth in *Brown v. Resort Developments*, 238 Va. 527, 385 S.E.2d 575 (1989).

> Every person is presumed to be of sound mind, and the burden is on the party who alleges to the contrary to establish such charge. The test for determining whether one lacks sufficient capacity to become bound absolutely by deed or contract is whether, at the time the instrument was executed, the grantor possessed sufficient mental capacity to understand the nature of the transaction and to agree to its provisions. Mental ability varies from one individual to another; therefore, no specific degree of mental acuteness is to be prescribed as the measure of one's capacity to execute a deed. And, when mental capacity is in issue, the outcome of every case must depend mainly on the facts surrounding the execution of the deed in question. Hence, the testimony of witnesses who were present when the instrument was executed is entitled to greater weight that the testimony of those witnesses not present.

*Brown*, 238 Va. at 529.

## Application of the Law

Without question, Mr. Jeffries was impaired in April 1994. The cause of that impairment is uncertain. Regardless, he had memory problems. He got lost occasionally. He had difficulty processing matters and verbalizing his thoughts. He was taking Cognex, which may or may not have improved his condition.

At the same time, when he met with Ms. Galloway in February and April 1994, Mr. Jeffries appeared to understand the nature of the transactions he was there to accomplish and to have the capacity to agree to them. He was cognizant of his property and how he wanted to dispose of it, by deed and will. He loved his daughter, and (not surprisingly) wanted to take care of her. That he may not have understood the details of how to avoid Medicaid liens (few of us would) is not the test of capacity. That the parties chose a means of title to the property (joint tenancy of Mr. and Ms. Thaiss with common law rights of survivorship) that much of the family may now regret is not the issue.

The Administrator ably presented persuasive evidence of Mr. Jeffries' limitations. But I find, based on all the evidence, that Mr. Jeffries had testamentary capacity and capacity to be bound by deed in April 1994.

I am well aware of the allegations contained in the divorce proceeding between Mr. and Ms. Thaiss. Whether Mr. Thaiss will ultimately be awarded any interest in this property is yet to be decided. But that proceeding, not this one, is the place to resolve how this property shall be divided equitably between them. "One man should not dictate, change, or annul another's will either in court or out. The preservation of the privilege of making one's own will brings to the old and helpless a consideration which might not otherwise always be extended to them, and should not be whittled away." *Tabb*, 155 Va. at 862. The privilege of making a deed is no less sacred.

In Chancery No. 174854, I deny the relief sought by the Administrator to invalidate the deed. In Fiduciary No. 67600, I grant the motion to set aside the appointment of the Administrator and admit the will to probate. I deny the requests of Mr. and Ms. Thaiss to be appointed as executor and executrix, respectively. If the parties can agree on a different executor or executrix, I will consider that appointment. Otherwise, I will choose someone.